**FEDERAL PAPER BOARD CO., INC., Plaintiff,**

v.

**HARBERT–YEARGIN, INC., Defendant.**

No. Civ.A.1:97CV0449AJEC.

United States District Court, N.D. Georgia, Atlanta Division.

July 9, 1999.

James McDonald, Christopher D. Balch, Swift, Currie, McGhee & Hiers, Atlanta, GA, for plaintiff.

Trammel Cullen Gilliland, Gray & Gilliland, Atlanta, GA, for defendant.

## ORDER

CARNES, District Judge.

This case is presently before the Court on defendant Harbert–Yeargin, Inc.'s Supplemental Brief in Support of its Motion for Summary Judgment [51] and plaintiff's Motion for Partial Summary Judgment [47]. The Court has reviewed the record and the arguments of the parties and, for the reasons set forth below, concludes that defendant Harbert–Yeargin, Inc.'s Supplemental Brief in Support of its Motion for Summary Judgment [51] should be **DENIED** and plaintiff's Motion for Partial Summary Judgment [47] should be **GRANTED.**

## BACKGROUND

Plaintiff owns and operates a paper mill in Augusta, Georgia. (Def.'s Statement of Material Facts [16] at ¶ 1.) Early in 1994, plaintiff began preparing "for a production line shutdown to perform routine maintenance on its dryer for the Number 2 paper machine." (Compl. [1] at ¶ 5.) At plaintiff's solicitation, contractors submitted bids to perform this work. (Def.'s Statement of Material Facts [1] at ¶ 1.)

On February 23, 1994, defendant submitted a bid to perform the required tasks for $59,750. (*Id.* at ¶ 3.) On March 28, after engaging in negotiations with Jim Michau, a senior plant engineer and project manager for plaintiff at the Augusta mill, concerning the cost, scope, and contractual provisions of the maintenance

work to be performed, defendant lowered its bid to $54,750. (*Id.* at ¶ 4.)

During the course of these negotiations, Michau delivered to defendant plaintiff's general terms and conditions to its purchase orders. (*Id.* at ¶ 5.) Michau instructed defendant to put in writing any objections it had to the proposed terms and conditions. (*Id.* at ¶ 6.) Thereafter, Marv Fischer, defendant's contracts manager, wrote an internal memorandum to Chuck Farris, the director of defendant's pulp and paper group, and Dave Massie, another employee of defendant, detailing a number of conditions that defendant did not wish to accept. (*Id.* at ¶ 7.) On March 30, Farris conveyed to plaintiff, via a letter to Michau, defendant's concerns regarding eight of the conditions dealt with in Fischer's memorandum. (Fischer Dep. at Exs. 3, 4.)[1]

One of the eight conditions defendant objected to was Article 26.2 of the proposed contract. As initially drafted, Article 26.2 would have required defendant to indemnify plaintiff for virtually any form of loss "directly or indirectly" related to activities arising out of the work to be performed under the contract. (Def.'s Mot. for Summ.J. [16] at Ex. 16, Art. 26.2.) Farris's letter proposed that Article 26.2 be changed so that defendant would only have to indemnify plaintiff for claims arising directly from defendant's own negligence. (Def.'s Statement of Material Facts [16] at ¶ 10.)

On April 4, Farris again wrote Michau.[2] In this letter, defendant reduced its bid price to $48,750, requested that the contract be issued based on the clarifications previously sent to plaintiff, and stated that it would begin to mobilize at plaintiff's mill on April 11 in preparation for the antici-

pated shutdown of the mill on April 18. (*Id.* at ¶ 11.) On April 5, defendant's construction manager, Tony Ross, had a conversation with Fred Chase, a representative of plaintiff's procurement department. This conversation led Ross to believe that plaintiff, through Chase, had accepted defendant's proposed revisions to plaintiff's general terms and conditions. (*Id.* at ¶ 12.) Following this conversation, Ross prepared to incorporate a few minor changes proposed by Chase into the alterations defendant had proposed in Farris's March 30 letter to Michau. (Ross Dep. at 32.)

As soon as Ross finished, and signed the letter that he was preparing, he received a conference call from Farris and Michau.[3] (Def.'s Stmt. of Mat. Facts [16].) Michau told Ross that plaintiff would not accept most of defendant's proposed alterations to the contract, including defendant's proposed changes to the indemnification agreement set out in Article 26.2. (*Id.* at ¶ 16; Michau Dep. at 88–89.) Ross then suggested that Michau propose alternative language and forward his proposal to defendant. Defendant contends that Michau committed to doing this by the sixth or seventh of April. (*Id.* at ¶ 15.) Plaintiff, through Michau's deposition testimony contradicts defendant's assertion that Michau agreed to submit proposed alternative language to be incorporated into plaintiff's general terms and conditions to its purchase orders. Rather, Michau stated that he informed defendant's representatives that they could either accept the terms and conditions, including the indemnification agreement, as originally proposed, or forego working in plaintiff's mill. (Michau Dep. at 71.) Neither Michau nor any other representative of plaintiff ever

---

1. The concerns expressed in the March 30 letter from Farris to Michau were the only objections to plaintiff's general terms and conditions that defendant ever made known to plaintiff. The remaining concerns included in Fischer's internal memorandum were never expressed to plaintiff. (Fischer Dep. at 50–51.)

2. On April 4, plaintiff also sent defendant a purchase order for the work to be performed.

3. David Massie was also in Ross's office at the time of this telephone call and took part in the discussion. (Ross Dep. at Ex. 2.)

forwarded a proposal for alternative language to defendant. (*Id.* at ¶ 17.)

The only remaining material fact pertaining to the existence of a contract containing an indemnity provision upon which the parties are in agreement is that at some point after the April 5 teleconference, the dates set for defendant to mobilize at the mill and begin work were pushed back a week. Most significantly, the parties disagree on the status of negotiations at the conclusion of the April 5 teleconference, and the meaning that should be attributed to a letter from Fischer to Michau on April 11, in light of that status.

Specifically, on April 11, Fischer sent Michau a letter requesting that Michau incorporate three agreed upon changes into the contract language.[4] This letter began, "The following is wording agreed to for the contract covering the referenced project. Please include in the contract and forward a copy for our review as agreed in your recent telephone conversation with Chuck Farris and Tony Ross." (Michau Dep. at Ex. 25.) The letter concluded by stating, "We hope this meets with your approval and look forward to hearing from you and receiving your contract." (*Id.*) Defendant contends that this letter merely memorialized three provisions upon which the parties had reached agreement, and that the remaining issues raised in Farris's March 30 letter were still unresolved. (Def.'s Statement of Material Facts [16] at ¶ 19.) Plaintiff, however, contends that these three issues were all that were left to be resolved, and at this point the parties

had reached an agreement.[5] (Pl.'s Resp. to Def.'s Statement of Material Facts [20] at ¶ 19.)

A number of memoranda internal to defendant were also issued around this time. Though these memoranda are dated after April 11, plaintiff contends that they predate the April 11 letter from Fischer to Michau and that the dates are out of sequence for the events as they actually occurred. (Pl.'s Resp. to Def.'s Statement of Material Facts [20] at ¶ 21, *citing* Farris Dep. at 111.) These memoranda imply that negotiations with plaintiff were still ongoing and a final agreement had not been reached. (Def.'s Statement of Material Facts [16] at ¶ 21.)

Defendant also took two further actions relevant to the issue of whether a contract existed between the parties to which the parties provide different meanings. First, on April 11, defendant provided plaintiff with certificates of insurance in the amount required by the contract. (Pl.'s Statement of Material Facts [17] at ¶ 7.) Plaintiff contends this action demonstrates the existence of an agreement between the parties, while defendant states that it took this action in anticipation of contracting. (*Id.*; Def.'s Resp. to Pl.'s Statement of Material Facts [18] at ¶ 7.) Second, on April 18, defendant mobilized workers and equipment at plaintiff's mill and began "preliminary pre-shutdown work." (*Id.* at ¶ 8.) Defendant claims it did this merely as a show of good faith in recognition of the fact that a shutdown at a paper mill results

---

**4.** None of these changes implicated Article 26.2.

**5.** Michau testified that the April 5 teleconference did not conclude when he informed Ross, Farris and Massie that plaintiff would not accept the majority of defendant's proposed changes to plaintiff's standard terms and conditions. Rather, Michau stated that a long conversation ensued in which the parties were able to come to terms. Michau related that plaintiff would accept the three changes to the contract included in Fischer's April 11 letter and defendant would drop the other

issues originally raised in the March 30 letter from Farris to Michau. Michau further stated that defendant was willing to drop the other issues, including those related to indemnification set out in Article 26.2, because it knew that plaintiff would need contractors to perform work on much larger projects in the future and it was attempting to get its foot in the door. (Michau Dep. at 93–95.) Farris agreed that the parties reached a final agreement pursuant to the April 11 letter from Fischer to Michau. (Farris Dep. at 119–120.)

in the loss of significant revenue.[6] Thus, defendant sought to demonstrate that it was ready to do the work. (*Id.*) Plaintiff, however, states that defendant does not allow its employees to begin to mobilize at a job site until a contract has been agreed to, and, therefore, this action demonstrates the existence of a contract. (Pl.'s Statement of Material Facts [17] at ¶¶ 8–9, citing Ross Dep. at 53.)

On April 18, Paul Timothy Powell, defendant's employee, was performing preliminary activities in plaintiff's Augusta mill in preparation for the shutdown scheduled for April 25. (Def.'s Statement of Material Facts [34] ¶ 34.) Prior to beginning work, Powell and other employees of defendant held a "tool box" meeting in which they discussed the jobs to be performed that day and the safety hazards presented, specifically: that the machines they would be working around would be operating, that the machines possessed rotating shafts, and that tools, clothing and bodies could be caught in the machines.[7] (*Id.* at ¶¶ 36–38.)

Part of Powell's duties on the eighteenth included erecting scaffolding around portions of plaintiff's number two paper machine. (*Id.* at ¶ 35.) From his attendance at the tool box meeting, he should have been aware that this machine would be operating and that it possessed an unguarded rotating shaft. (*Id.* at ¶ 37.) Powell attempted to build a guard to place over the shaft. (*Id.* at ¶ 43.) After deciding that he could not use the guard he had built, however, he attempted to build a scaffold above the rotating shaft. (*Id.*) Together with George Cassity, another employee of defendant who plaintiff alleges was acting as Powell's foreman,[8] Powell erected pole scaffolding next to the number two paper machine. (*Id.* at 44.) While engaged in this activity, Powell was wearing safety lines, or "lanyards", which he "bundled" in an attempt to prevent them from tripping him, or from becoming entangled in the functioning machine. (*Id.* at ¶ 45.) After completing the erection of the pole scaffolding, Powell and Cassity proceeded to lay planks of wood over the horizontal pole scaffolding support members. (Cassity Aff. [16] at Ex. A, ¶ 11.) These planks were to serve as a platform for workers during the mill-wide shutdown. (*Id.*)

While moving about the pole scaffolding and preparing to install additional wooden planks upon the pole scaffolding, Powell leaned forward. (*Id.* at ¶ 12.) Tragically, one of the safety lines attached to Powell's body swung free, caught on the rotating shaft,[9] and pulled Powell forward, off the scaffolding and into the machine. (Def.'s Statement of Material Facts [16] at ¶ 46.) As a result, Powell suffered fatal injuries. (*Id.* at ¶ 46.)

On April 19, defendant withdrew its employees from plaintiff's mill, claiming that there was no contract between the parties. (Pl.'s Statement of Material Facts [17] at ¶¶ 11–12.) Plaintiff took possession of de-

---

**6.** Plaintiff alleged that the shutdown of a paper mill could result in up to $200,000 in lost revenue per day. (Compl. [1] at ¶ 6.)

**7.** While plaintiff admits most of defendant's submitted material facts pertaining to the danger presented by the rotating shaft at the center of this controversy, it continuously asserts that, though the danger presented by the presence of rotating shafts was discussed and readily apparent, the rotating shaft in question had a "protruding grease fitting" on its end which was neither discussed nor readily apparent. (Pl.'s Resp. to Def.'s Statement of Material Facts [20] at ¶¶ 38–39, 41–44.)

**8.** Plaintiff asserts that Cassity was acting as Powell's foreman and was directing Powell's actions on defendant's behalf on April 28. (Pl.'s Resp. to Def.'s Statement of Material Facts [20] at ¶ 44.) Plaintiff did not direct the court to any evidence, however, to support this assertion.

**9.** Plaintiff contends, specifically, that the safety line caught on a protruding grease fitting on the shaft that was not readily apparent and had not been discussed at the tool box meeting. (Pl.'s Resp. to Def.'s Statement of Material Facts [20] at ¶ 46.)

fendant's equipment [10] and performed the maintenance work with the aid of another contractor. (*Id.* at ¶ 13.)

Powell's widow sued plaintiff, and one of its employees, for the wrongful death of her husband. (Compl. [1] at ¶ 24.) On March 15, 1995, plaintiff informed defendant that a lawsuit was imminent and requested that defendant accept defense of the claim pursuant to an indemnity clause in the contract. (Pl.'s Stmt. of Mat. Facts [39] at ¶ 2; Def.'s Resp. to Pl.'s Stmt. of Mat. Facts [49] at ¶ 2.) Two days later, defendant's general counsel denied liability and refused to participate in the defense of the claim. (Pl.'s Stmt. of Mat. Facts [39] at ¶ 3; Def.'s Resp. to Pl.'s Stmt. of Mat. Facts [49] at ¶ 3.) The suit was settled for $781,448.[11] Plaintiff thereafter brought this suit seeking to enforce a contractual indemnification obligation it claims it is owed by defendant.[12] Both parties moved for summary judgment. On June 5, 1998, the Court issued an order denying both parties' motions for summary judgment. (*See* Order [30].) The issues raised in those motions for summary judgment revolved around the existence of a binding contract between the parties. In the order, the Court determined that there existed a material issue of genuine fact that precluded the Court's determination regarding the existence of a contract between the parties as a matter of law.

In addition, the Court noted that the parties had provided insufficient guidance as to the possible effect of the indemnification agreement. The Court recognized that

> [u]nder Georgia law, if a party seeking to be indemnified had a complete defense to the underlying action, then a

claim for indemnification may not be maintained. *Foster v. Nix,* 173 Ga.App. 720, 727, 327 S.E.2d 833 (1985). That is, in the absence of a legal compulsion to suffer a loss, there is no right to sue a third party for indemnification for that loss. *GAF Corp. v. Tolar Constr. Co.,* 246 Ga. 411, 271 S.E.2d 811 (1980). Defendant argues that plaintiff had a complete defense to the claims made by Mr. Powell's widow—based on either an assumption of the risk theory or the doctrine of avoidance—and hence that defendant should not be required to indemnify plaintiff.

> Conversely, O.C.G.A. § 51–12–32(c) provides: Without the necessity of being charged by an action or judgment, *the right of indemnity,* express or implied, from another or others shall continue unabated and *shall not be lost or prejudiced by compromise and settlement of a claim* or claims for injury to person or property or for wrongful death and release therefrom.

O.C.G.A. § 51–12–32(c) (emphasis added). Thus, plaintiff argues that the mere fact that plaintiff settled the underlying action does not preclude its action for indemnification.

The parties have offered little guidance to the Court as to how these potentially inconsistent principles may be harmonized nor as to how the phrase "complete defense" should be defined. Similarly, in the discussion of the potential defenses of assumption of the risk and avoidance, neither party identifies the negligent act for which Mr. Powell assumed the risk nor are the parties consistent about whether it is plaintiff's negligence, defendant's negligence, or

**10.** Article 21 of plaintiff's proposed general terms and conditions gave plaintiff the right to seize defendant's tools and equipment should defendant fail to comply with the contractual provisions. (Pl.'s Mot. for Summ.J. [17] at 4.)

**11.** As Powell's employer, defendant was immune from direct suit for Powell's death un-

der Georgia's worker's compensation law. (Def.'s Resp. to Mot. for Summ.J. [18] at 2 n. 1.)

**12.** This suit was originally filed in state court and was subsequently removed on the basis of diversity jurisdiction. (*See* Notice of Removal [1].)

both, on which the Court should focus in analyzing these defenses.

With these questions unanswered, determination of the summary judgment motion has been difficult. Although not granting summary judgment, however, the Court will further outline its concerns in order that counsel may address these issues prior to any trial of this case.

(Order [30] at 22–24.)

Counsel have responded to the Court's invitation, and at the pretrial conference, counsel discussed several issues of law regarding the enforceability of the indemnification contract purportedly in effect between the parties. After hearing both parties argue over the effect of Georgia law on the indemnification contract at issue in this case, the Court asked both parties to submit additional briefing on two issues. First, the Court invited defendant to address the issue of whether the indemnification contract violated public policy and could not be enforced pursuant to O.C.G.A. § 13–8–2(b). Second, the Court invited plaintiff to address the issue discussed in the original order—that is, whether the term "complete defense" in an indemnification contract action is a defense that would bar the underlying claim as· a matter of law or does the term indicate a defense at trial, requiring this Court to empanel a "mock trial" in which the underlying liability would be determined by a jury. Presently before the Court are plaintiff and defendant's submissions including the appropriate response briefs and reply briefs on these issues.

## DISCUSSION

### I.  Summary Judgment Standard

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits. Instead, Rule 56 of the Federal Rules of Civil Procedure *man-*

*dates* the entry of summary judgment against a party who fails to make a showing ·sufficient to establish the existence of *every* element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Id.* at 322–23, 106 S.Ct. 2548.

The movant bears the initial responsibility of asserting the basis for his motion. *Id.* at 323, 106 S.Ct. 2548; *Apcoa, Inc. v. Fidelity Nat'l Bank,* 906 F.2d 610, 611 (11th Cir.1990). However, the movant is not required to negate his opponent's claim. The movant may discharge his burden by merely " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. After the movant has carried his burden, the nonmoving party is then required to "go beyond the pleadings" and present competent evidence [13] designating " 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)). While the court is to view all evidence and factual inferences in a light most favorable to the nonmoving party, *Samples v. City of Atlanta,* 846 F.2d 1328, 1330 (11th Cir. 1988), "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A fact is material when it is identified as such by the controlling substantive law. *Id.* at 248, 106 S.Ct. 2505. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for

---

**13.** The nonmoving party may meet its burden through affidavit and deposition testimony, answers to interrogatories, and the like. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

the nonmovant. *Id.* at 249–50, 106 S.Ct. 2505. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505. Thus, to survive a motion for summary judgment, the nonmoving party must come forward with specific evidence of *every* element material to that party's case so as to create a genuine issue for trial.

## II. *Defendant's Supplemental Motion for Summary Judgment*

In this supplemental brief, defendant argues that the indemnification provision of the contract is void as a matter of public policy as mandated by O.C.G.A. § 13–8–2(b).[14] Plaintiff, on the other hand, argues that O.C.G.A. § 13–8–2(b) does not apply to the indemnification provision as the contract is not one "relative to the construction, alteration, repair or maintenance of a building structure, appurtenances, and appliances." O.C.G.A. § 13–8–2(b). In addition, plaintiff argues that section 13–8–2(b) does not apply because the indemnification provision can be read to only require defendant to indemnify plaintiff for losses as a result of the combined negligence of the parties and not as a result of the sole negligence of plaintiff. Alternatively, plaintiff argues that, even if section 13–8–2(b) does apply, the contract is exempted from the public policy concerns because the contract contemplates that any liability incurred by Federal is to be paid out of the insurance specifically required by the contract.

As an initial matter, the Court must set out the relevant contract and statutory language. Section 26.2 of the General Conditions of the contract between plaintiff and defendant provides:

> The Contractor agrees to protect, defend, indemnify, and hold the Owner, Owner's Representative, and employees of the Owner and Engineer, free and harmless from and against any and all losses, claims, liens, demands and causes of action of every kind and character including the amount of judgments, penalties, interest, court costs, and legal fees incurred by either in defense of same, arising in favor of either party, including governmental agencies or bodies, on account of taxes, claims, liens, debts, personal injuries including employees of the Owner and Owner's Representative, death, or damages to property (including property of the Owner) and without limitation by enumeration, all other claims or demands of every character occurring or in anywise incident to, in connection with or arising directly or indirectly out of the Work to be performed by the Contractor hereunder. The Contractor further agrees to investigate, handle, respond to, provide defense for, and defend any such claim, demand, or suit at his sole expense and agrees to bear all other costs and expenses related thereto, even if it (claim, etc.) is groundless, false, or fraudulent.

(Def.'s Br. in Supp. of Mot. for Summ.J. [16] at Ex. 15 ("Contract") at 15.)

Section 26.4 of the general provisions provides:

> Comprehensive General Liability (including coverage for demolition of any building, structure, collapse, blasting and excavation below surface of the ground) policies shall be written for this

---

14. For the purposes of this order, the Court assumes that there existed an otherwise enforceable contract between the parties. Included in this contract is a provision requiring defendant to indemnify plaintiff as discussed *infra*.

particular Project and the amount of coverage shall be as follows:

.1 Public Liability, except automobile, bodily injury, or death — $ 500,000/person $1,000,000/occurrence

.2 Property Damage — $ 500,000/occurrence

.3 Coverage should include Completed Operations for one (1) year after completion and acceptance of the Work by the Owner and also Contractual Liability.

(Contract at 16.) Further, sections 26.8 and 26.9 provide:

All of the above insurance shall be obtained from an insurance carrier or carriers authorized to do business in the state where the work is to be performed and satisfactory to the Owner.

Certificates of insurance afforded above shall be filed with the Owner prior to commencing any part of the Work hereunder. Such certificates shall provide that this insurance is not subject to change or cancellation until ten (10) days written notice has been given to the Owner.

(*Id.* at 16.)

Finally, O.C.G.A. § 13–8–2(b) states

[a] covenant, promise, agreement, or understanding in or in connection with or collateral to a contract or agreement relative to the construction, alteration, repair, or maintenance of a building structure, appurtenances, and appliances, including moving, demolition, and excavating connected therewith, purporting to indemnify or hold harmless the promisee against liability for damages arising out of bodily injury to persons or damage to property caused by or resulting from the sole negligence of the promisee, his agents or employees, or indemnitee is against public policy and is void and unenforceable, provided that this subsection shall not affect the validity of any insurance contract, workers' compensation, or agreement issued by an admitted insurer.

O.C.G.A. § 13–8–2(b) (Supp.1998). The Court will now consider whether this statute invalidates the indemnification provision.

A. *Is the indemnification provision a covenant "collateral to a contract or agreement relative to the construction, alteration, repair, or maintenance of a building structure, appurtenances, and appliances" pursuant to section 13–8-2(b)?*

█ Both parties agree that for section 13–8–2(b) to apply, the contract at issue in this case must be a contract "relative to the construction, alteration, repair, or maintenance of a building structure, appurtenances, and appliances." The parties disagree, however, as to whether the contract in the instant case fits into the statutory definition and as such, whether the statutory prohibition against indemnification contracts even applies.

Defendant argues that the case law developed interpreting section 13-8-2(b) establishes that the statutory provision applies to contracts that do not involve the actual construction of a building but also the construction, maintenance, or repair of structures, appliances, and appurtenances within a particular building. (Def.'s Supplemental Br. in Supp. of Mot. for Summ.J. [51] at 12.) Accordingly, defendant argues that Powell was engaged in constructing scaffolding around portions of the large number two paper machine in plaintiff's paper mill at the time he died. This work, defendant asserts, was preliminary to the repair and maintenance of the huge paper machine. Furthermore, defendant claims that the contract between the parties contemplated the repair and maintenance of other "mammoth machinery" in the plant. (*Id.* at 8.) Hence, defendant contends that the work performed under the contract involved the repair of building structures, appliances, or appurtenances for the purposes of section 13–8-2(b).

Plaintiff, on the contrary, argues that the work contemplated under the contract was not work performed upon a building structure but rather work performed to upgrade two large paper machines. (Pl.'s

Resp. to Def.'s Supplemental Br. in Supp. of Mot. for Summ.J. [49] at 7.) Plaintiff argues that, however large, the paper machines are not buildings or building structures. Moreover, plaintiff contends that the definitions of appurtenances and appliances also do not cover the paper machines at issue in the case. Finally, plaintiff argues that the purpose of the statute is to prevent a building contractor from contracting away liability for accidents caused by its sole negligence and was never intended to encompass machine or equipment repair contracts. (*Id.* at 10–11.)

Because the Court concludes, *supra,* that section 13–8–2(b) does not apply to this situation because the insurance clauses save the indemnification provision from violating public policy, the Court assumes for the purposes of this motion that defendant's interpretation is correct—that is, the indemnification provision relates to a contract for "the construction alteration, repair, or maintenance of a building structure, appurtenances, and appliances." Even without such an assumption, however, the Court would likely find that the statute does encompass the type of contract at issue in this case. Plaintiff's argument that the repair work to the paper machines in this case was not a repair to a building structure, appurtenance, or appliance is unavailing.

Although the Georgia courts have not defined precisely the terms "building structures, appurtenances, or appliances," the courts have applied the definition liberally. Indeed, the courts have not applied this section to construction contracts only, but the courts have applied this section to both commercial and residential leases as well. *See World Championship Wrestling, Inc. v. City of Macon,* 229 Ga. App. 248, 493 S.E.2d 629 (1997) (applying section 13–8–2(b) to lease of arena for wrestling event); *Terrace Shopping Center Joint Venture v. Oxford Group, Inc.,* 192 Ga.App. 346, 384 S.E.2d 679 (1989) (applying section 13–8–2(b) to management agreement between shopping center owner and managing company); *National Candy Wholesalers, Inc. v. Chipurnoi, Inc.,* 180 Ga.App. 664, 350 S.E.2d 303 (1986) (applying section 13–8–2(b) to space lease agreement); and *Big Canoe Corp. v. Moore & Groover, Inc.,* 171 Ga.App. 654, 320 S.E.2d 564 (1984) (applying section 13–8–2(b) to rental and maintenance agreement between resort owner and maintenance company). Moreover, the Georgia courts have applied section 13–8–2(b) to contracts for repair and maintenance within an existing commercial structure. *See Tuxedo Plumbing & Heating Co. v. Lie–Nielsen,* 245 Ga. 27, 262 S.E.2d 794 (1980) (applying section 13–8–2(b) precursor statute to contract for plumbing work performed on existing apartment complex) and *Georgia State Telephone Co. v. Scarboro,* 148 Ga. App. 390, 251 S.E.2d 309 (1978) (applying section 13–8–2(b) precursor statute to contract for laying telephone wire and manhole covers). *See also Watson v. Union Camp Corp.,* 861 F.Supp. 1086 (S.D.Ga. 1994) (Nangle, J.) (applying section 13–8–2(b) to contract for installation of vent collection system at plant).

Accordingly, consistent with the Georgia courts' expansive interpretation of section 13–8–2(b), the Court concludes that, if faced with the instant repair contract, a Georgia court would determine that it fell within the ambit of the statute, construing the two large paper machines in this case as either "appurtenances"[15] or "appli-

**15.** The parties use dictionary definitions to elucidate the possible meanings of the term "appurtenances." Defendant selected the *Webster New Collegiate Dictionary*'s definition of appurtenance as " 'subordinate parts,' 'accessory objects,' and 'apparatus' " and *Ballentines' Law Dictionary*'s definition of appurtenance as " 'thing belonging to another or principal thing and which passes as an in-

cident to the principal thing' as well as 'personal property intimately connected with the operation of the principal thing which is mortgaged.' " (Def.'s Supplemental Br. in Supp. of Mot. for Summ.J. [51] at 17.) Plaintiff chooses to use *Black's Law Dictionary*'s definition of appurtenance as "An adjunct, appendage, or annexation, likened to an outhouse, barn, garden or orchard." (Pl.'s Resp.

ances." [16]

**B.** *Can the indemnification provision be read to only require defendant to indemnify plaintiff for losses as a result of the combined negligence of the parties and not as a result of the sole negligence of plaintiff and thus avoid the harsh consequences of section 13–8–2(b)?*

■ Assuming that § 13–8–2(b) applies to the instant indemnification provision, the Court will now address plaintiff's argument that the provision can be read to take it outside section 13–8–2(b). Plaintiff argues that the Court has the authority to read the indemnification provision as requiring defendant to indemnify plaintiff only for the combined negligence of the parties and not for plaintiff's sole negligence. Such a construction of the indemnification provision would remove the provision from the scope of section 13–8–2(b) and allow the Court to enforce the indemnification agreement; that is, section 13–8–2(b) only prohibits indemnification contracts that purport to require the indemnitor to become liable for injuries caused by the sole negligence of the indemnitee but does not prohibit indemnification contracts which purport to require the indemnitor to become liable for injuries caused the joint negligence of both the indemnitor and indemnitee. Plaintiff's argument, however, has been foreclosed by a recent line of Georgia case law holding contract provisions identical to the indemnification provision in the instant case to be in violation of section 13–8–2(b).

As summarized by Judge Nangle in *Watson v. Union Camp Corp.*, 861 F.Supp. 1086, 1091 (S.D.Ga.1994), "[t]wo conflicting lines of authority exist in Georgia concerning the extent to which a contract must express an intent to indemnify a party against his sole negligence to be in violation of section 13–8–2(b) or its predecessor." Judge Nangle described the two conflicting lines of cases:

> Numerous decisions of the Georgia Court of Appeals have refused to hold that the parties to an indemnification agreement intended to protect each other against their own sole negligence absent clear indication to the contrary. E.g., *Batson–Cook Co. v. Georgia Marble Setting Co.*, 112 Ga.App. 226, 144 S.E.2d 547, 552 (1965); see also *Buffington v. Sasser*, 184 Ga.App. 800, 363 S.E.2d 2, 6 (1987) (refusing to find indemnification provision referring to "any and all liabilities" void under section 13–8–2(b), since "[i]t does not expressly apply to damage caused by [indemnitee's] own negligence"); *Seaboard Coast Line R.R. Co. v. Union Camp Corp.*, 145 Ga.App. 417, 243 S.E.2d 631, 633 (1978) (finding it "quite obvious" that indemnification against "any and all loss" did not extend to indemnitee's own negligence). Furthermore, the Georgia Court of Appeals has held that an indemnification provision functionally identical to the one at issue did not purport to indemnify a party from his sole negligence. See *Georgia State Tel. Co. v. Scarboro*, 148 Ga.App. 390, 251 S.E.2d 309, 310 (1978) (interpreting provision that read: "The contractor shall save harmless the telephone company from and indemnify it against all claims and suits for injury or damage to any person or property whatsoever, including death, which may arise in or result from the performance of the work covered by this contract." (emphasis added)).

---

to Def.'s Supplemental Br. in Supp. of Mot. for Summ.J. [49] at 8.)

**16.** Once again, the parties wage a battle of the dictionaries. Defendant chooses *Webster's New Collegiate Dictionary*'s definition of appliance as "an instrument or device designed for a particular use." (Def.'s Supplemental Br. in Supp. of Mot. for Summ.J. [51] at 17.) Plaintiff selects the *American Heritage Dictionary*'s definition of appliance as "a device or instrument, especially one operated by electricity and designed for household use." (Pl.'s Resp. to Def.'s Supplemental Br. in Supp. of Mot. for Summ.J. [49] at 9.)

The Georgia Supreme Court, however, has held that the phrase "any claim" includes claims for the indemnitee's sole negligence, even if the agreement does not expressly cover sole negligence. *Frazer v. City of Albany*, 245 Ga. 399, 265 S.E.2d 581, 583 (1980). The Frazer court considered two provisions of a lease agreement:

> Section 6.9 of the lease provides: "The City shall indemnify and save the Authority and Trustee harmless against and from all claims by and on behalf of any person, firm or corporation arising from the contract or management of or from any work or thing done on the project during the Lease term ..." Section 8.1 of the proposed lease says: "The City releases the Authority from, agrees that the Authority shall not be liable for, and agrees to hold the Authority harmless against any loss or damage to property, or any injury to or death of any person that may be occasioned by any cause whatsoever pertaining to the project or the use thereof ..."

*Id.* Although the lease provisions did not expressly protect the indemnitee from its sole negligence, the Frazer court found that the provisions violated Ga. Code Ann. § 20–504, which preceded O.C.G.A. § 13–8–2. Id. While not expressly overruling the earlier line of appeals court decisions, the Frazer holding has spawned a separate line of appeals court decisions in direct conflict with the earlier cases. See, e.g., *Borg–Warner Ins. Fin. Corp. v. Executive Park Ventures*, 198 Ga.App. 70, 400 S.E.2d 340, 341 (1990) (finding "all liability" provision purported to waive indemnitee's liability for its sole negligence), *cert. granted and appeal dismissed*, 405 S.E.2d 876 (Ga.1991); *Chipurnoi*, 350 S.E.2d at 305 (finding "all claims" language "necessar-

ily includes claims emanating from injuries caused solely by [indemnitee's] negligence"); *Big Canoe Corp. v. Moore & Groover, Inc.*, 171 Ga.App. 654, 320 S.E.2d 564, 565 (1984) (holding "all claims" language to be "clearly violative" of section 13–8–2(b)).

*Id.* at 1091–92.

The language in the indemnification provision in the instant case—"any and all losses, claims, liens, demands and causes of action of every kind and character"—is almost identical to the the "all claims" language used in the indemnification provision of the release in *Watson*. In *Watson*, Judge Nangle observed, "[t]he Court finds no meaningful distinction between the 'all claims' language used in the indemnification provision [in the instant case] and the language used in the contract held invalid by the Georgia Supreme Court in Frazer, a decision binding upon this Court." *Id.* at 1092 (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)).

Not only is the language similar to the language in *Watson*, but the "any and all losses, claims, liens, demands and causes of action of every kind and character" language is also similar to the language in the contract at issue in *World Championship Wrestling, Inc. v. City of Macon*, 229 Ga.App. 248, 493 S.E.2d 629 (1997). In *WCW*, the Georgia Court of Appeals noted that the language "all demands, claims, suits, actions, or liabilities" standing alone would violate public policy pursuant to O.C.G.A. § 13–8–2(b). *Id.* 229 Ga.App. at 249, 493 S.E.2d at 630.

Accordingly, the Court assumes that the language in the indemnification provision, standing alone, would violate section 13–8–2(b) as it includes an obligation for defendant to indemnify plaintiff for claims resulting from plaintiff's sole negligence.[17]

17. That the Court so concludes does not mean that this court would reach the same result were it not required to decide which of the two conflicting lines of authority Georgia courts would be required to follow. The like-

ly winning line invalidates parties' efforts to agree to an arms-length indemnification provision, merely because the provision could be interpreted broadly to create indemnification beyond what public policy recognizes, even

This determination, however, does not end the Court's inquiry.

### C. Do the insurance provisions in the contract save the indemnification provision from the purview of section 13–8–2(b)?

■ Plaintiff argues that the inclusion of the mandatory insurance provisions in the contract takes the indemnification provision out of the purview of section 13–8–2(b). Plaintiff finds support for his contention in several cases. In *Tuxedo Plumbing & Heating Co., v. Lie–Nielsen,* 245 Ga. 27, 28, 262 S.E.2d 794, 795–96 (1980), the Supreme Court of Georgia first recognized such an exception to section 13–8–2(b)'s predecessor. The Court found that "neither the insurance clause nor the contract's 'hold harmless clause' requires ... that the one indemnify the other and hold him harmless from his own sole negligence. Rather, the insurance clause shifts the risk of loss to the insurance company regardless of which party is at fault." *Id.* Because of the mandatory insurance provision in the contract, the Court found that the indemnification clause did not violate public policy and the code section did not apply.

Since the Georgia Supreme Court's decision in *Tuxedo Plumbing,* the Georgia Court of Appeals has seized upon this concept and applied the insurance exception to exempt otherwise unenforceable indemnification clauses from the purview of section 13–8–2(b). In *McAbee Construction Co. v. Georgia Kraft Co.,* 178 Ga.App. 496, 343 S.E.2d 513 (1986), the Georgia Court of Appeals addressed a situation similar to the instant case. While recognizing that the indemnification provision, taken by itself, would run afoul of O.C.G.A. § 13–8–

2(b), the court found that the mandatory insurance provisions in the contract affected the contract's validity. The insurance provision stated

> The Contractor shall during the performance of this Contract keep in force the following insurance, in favor of Owner and Contractor with cross liability clauses, as follows: ... The Contractor shall also during the performance of this Contract keep in force Workmen's Compensation coverage as required by law, and Employer's Liability Insurance, with limits not less than $100,000. Before commencing work the Contractor must submit to Owner an Insurance Certificate reflecting the coverages and limits set forth above, ... plus a notation that the specific indemnity provision in Article X is covered and a notation that insurance will not be cancelled [sic] unless ten (10) days' prior notice in writing is given by insurer to Owner ...

*Id.* 178 Ga.App. at 497–98, 343 S.E.2d at 515. The court determined that "[t]he two provisions must be construed and considered together: 'In the construction of a contract the cardinal rule is to ascertain the intention of the parties, and to this end the whole contract must be considered.'" *Id.* 178 Ga.App. at 498, 343 S.E.2d at 515 (quoting *Hull v. Lewis,* 180 Ga. 721, 180 S.E. 599 (1935)). The Court found that the indemnification and insurance provisions, taken together, clearly evidenced the parties' intent to have any liability covered by insurance, thereby removing the contract from section 13–8–2(b).

Similarly, in *Terrace Shopping Center Joint Venture v. Oxford Group, Inc.,* 192 Ga.App. 346, 384 S.E.2d 679 (1989), the Georgia Court of Appeals again found that an insurance provision excepted an indem-

---

though the provision also triggers an indemnity obligation consistent with public policy. Clearly, it is simple enough for a court to strike or refuse to enforce the former provision. Refusal to do so results in a refusal to enforce that part of the parties' agreement which clearly inhabits a safe public policy zone. Moreover, such a determination, par-

ticularly when applied to relatively unsophisticated parties operating without the advice of sound counsel, carries a "gotcha," gamesman-like quality that is at odds with a common-sense approach to legal interpretation that shall be the goal of a national legal system.

nification contract from the scope of section 13–8–2(b). In that case, the parties entered into a contract which contained the following language

> Both owner [i.e., the appellant] and [the appellee] acknowledge that owner currently is responsible for maintaining all insurance coverage on the project.... Indemnity by the owner. The owner shall indemnify [appellee] against and hold and save [appellee] free and harmless from any liability or expense ... arising out of injuries or damages to persons or property, by reason of any cause whatsoever (other than the gross negligence, the wilful and intentional misconduct of [appellee] or its agents or employees, or bad faith by [appellee] in failing to perform its duties hereunder) occurring on or around the project, or elsewhere. The owner also further agrees to list the [appellee] as "additionally" named insured on any and all liability insurance policies maintained by owner with insurance to that effect.

*Id.* 192 Ga.App. at 347, 384 S.E.2d at 680. Relying on this provision, the court held that the indemnification provision, coupled with the insurance provision, did not violate section 13–8–2(b), because "the insurance clause shifts the risk of loss to the insurance company regardless of which party is at fault." *Id.* 192 Ga.App. at 348, 384 S.E.2d at 680 (citing *McAbee Constr. Co.*, 178 Ga.App. at 498, 343 S.E.2d 513).

Most recently, the Georgia Court of Appeals reaffirmed this line of authority in *World Championship Wrestling, Inc. v. City of Macon*, 229 Ga.App. 248, 493 S.E.2d 629 (1997). Without actually quoting the insurance provision, the court found that, although the indemnification clause, standing alone, might violate public policy pursuant to section 13–8–2(b), the

provision requiring the WCW to purchase liability insurance for the benefit of the City of Macon "shifts the risk of loss to the insurance company regardless of which party is at fault." *Id.* 229 Ga.App. at 249, 493 S.E.2d at 630. Accordingly, the court enforced the indemnification agreement.

Although defendant acknowledges the case law cited by plaintiff discussed *supra,* defendant argues that the insurance provision in the instant case differs from those in *Tuxedo Plumbing, McAbee Construction, Terrace Shopping Center,* and *WCW,* because in those cases the insurance provision explicitly declared that the insurance was for the purpose of protecting both the indemnitee and the indemnitor.[18] Defendant contends that the insurance provisions in the contract at hand were not intended to cover against plaintiff's own liability, nor include plaintiff as an insured on defendant's policy, and accordingly, were never intended to "insure over its indemnity obligations." (Def.'s Reply Br. [53] at 16.)

Plaintiff, on the other hand, argues that section 26.4 explicitly requires defendant to carry insurance to cover its "contractual liability." In its brief, plaintiff defines the term "contractual liability," utilized in section 26.4 of the contract, as "any liability assumed under a contract." (Pl.'s Resp. to Def.'s Supplemental Br. in Supp. of Mot. for Summ.J. [49] at 12–13.) More specifically, plaintiff defines contractual liability as "[b]odily injury or property damage for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement." *Id.* at 13. (citing Roland H. Long, *The Law of Liability Insurance,* Vol. IV (1997)). By inserting the term "contractual liability" into the insurance provision of section 26.4, plaintiff argues that the parties intended

---

18. Curiously, in its reply brief, defendant argues that section 26.1 of the parties' contract explicitly requires defendant to provide insurance "insuring himself against liability for damage to persons or property arising in any way from his performance of this Contract." (Def.'s Reply Br. [53] at 13.) This provision, however, is not the provision that plaintiff claims removes the indemnification provision from the scope of section 13–8–2(b). Plaintiff argues that it is section 26.4, set out *supra,* that requires defendant to maintain insurance coverage to cover its contractual liability.

the mandatory insurance contemplated by section 26.4 to cover the contracted for liability pursuant to the indemnification agreement. Accordingly, plaintiff asserts that the insurance provision would cover defendant for any liability incurred by plaintiff pursuant to the indemnification provision, regardless of which party was determined to be negligent for the underlying injury. *See also Southern Guar. Ins. Co. v. Zantop Int'l Airlines, Inc.,* 767 F.2d 795, 798 n. 3 (11th Cir.1985) ("just as an insured may obtain coverage for his own legal liability, he may agree to indemnify another against liability imposed upon that other by law and obtain insurance coverage to provide against that contingency").

The Court finds plaintiff's argument persuasive. Pursuant to binding Georgia precedent, the Court must construe the indemnification provision together with the insurance provisions " 'to ascertain the intention of the parties, and to this end the whole contract must be considered.' " *McAbee Construction,* 178 Ga.App. at 498, 343 S.E.2d at 515 (quoting *Hull v. Lewis,* 180 Ga. 721, 180 S.E. 599 (1935)). By including the mandatory insurance provision of section 26.4, the parties intended to shift the risk of loss to defendant's insurance company, regardless of which party was at fault for any prospective injury. The term "contractual liability" utilized in section 26.4 solidifies this intent. The term, as defined in the industry, is insurance covering obligations undertaken pursuant to a contract. *See Southern Guar. Ins. Co.,* 767 F.2d at 798 n. 3; *see also* 7A John A. Appleman, *Insurance Law and Practice,* § 4497.02 (rev. ed.1979).

Defendant asserts that the term "contractual liability" is not a term of art within the insurance industry, arguing that plaintiff took the term "contractual liability," and its subsequent definition of the term, from the insurance policy definitions in the *Southern Guaranty* case. Defendant contends that the term and its definition were specific to that case, and the definition of "contractual liability" came directly from "the definition section of the insurance contract at issue in that case." (Def.'s Reply Br. [53] at 13.) This argument, however, does not persuade the Court. The Court found numerous cases utilizing the term "contractual liability" and defining the term much like the Eleventh Circuit did in *Southern Guaranty. Compare Southern Guar. Ins. Co. v. Zantop Int'l Airlines, Inc.,* 767 F.2d 795, 798 n. 3 (11th Cir.1985) *with Redfeather v. Chevron USA, Inc.,* 57 Cal.App.4th 702, 67 Cal.Rptr.2d 159, 161 n. 3 (1997) ("Liability insurance policies often include a contractual liability clause providing coverage for the tort liability of another which the policyholder incurs by way of contract"). *See also Cruz–Mendez v. ISU/Ins. Serv. of San Francisco,* 156 N.J. 556, 722 A.2d 515, 519 (1999); *Jefferson Ins. Co. of New York v. Travelers Indemnity Co.,* 92 N.Y.2d 363, 681 N.Y.S.2d 208, 703 N.E.2d 1221, 1224 (1998); *Computalog USA Inc. v. Mallard Bay Drilling, Inc.* 21 F.Supp.2d 620, 623 (E.D.La.1998); *Martin v. 1212 South Philadelphia Boulevard Partnership,* 1998 WL 472464 at *1 n. 2 (E.D.Pa. July 23, 1998); *Employers Mutual Cas. Co. v. A.C.C.T., Inc.,* 580 N.W.2d 490, 491 (Minn.1998); *National Union Fire Ins. Co. of Pittsburgh, Pa. v. John Zink Co.,* 972 S.W.2d 839, 844 (Tex.App.1998); *Penn America Ins. Co. v. Florida Power & Light Co.,* 710 So.2d 597, 599 (Fla.Dist.Ct.App.1998); and *Waddell v. LTV Steel Co.,* 124 Ohio App.3d 350, 706 N.E.2d 363, 366 (1997). This list is not exhaustive.

Moreover, sections 26.8 and 26.9 require defendant to select an insurance company meeting plaintiff's approval and require defendant to file copies of the certificates of insurance with plaintiff. Furthermore, the indemnification provision and the insurance provisions appear under the same section in the contract under the section title "ARTICLE 26—CONTRACTOR'S LIABILITY INSURANCE." Although the contract itself does not explicitly state in the indemnification provision that the insurance will cover loss caused solely by

plaintiff's negligence,[19] the inclusion of section 26.4, coupled with the approval and filing requirements of sections 26.8 and 26.9, indicate that the parties intended for defendant to carry insurance to cover its contracted for liability under the indemnification provision.

Defendants arguments to the contrary are not persuasive. First, as discussed *supra*, defendant argues that section 26.1 of the contract only requires the provision of insurance for the benefit of defendant. This argument, however, fails to address the application of section 26.4.3, expressly indicating that defendant's "[c]overage shall include ... Contractual Liability."[20] (Contract at 16.) Moreover, defendant omits any explanation why, if it was only required to carry coverage that benefitted itself and not plaintiff, sections 26.8 and 26.9 require plaintiff to approve any insurance carrier and policy and require defendant to file certificates of insurance with plaintiff.

Accordingly, as the contract for indemnification must be read in conjunction with the insurance provisions of the contract, the Court finds that the parties intended to shift the risk of loss under the contract to insurance and did not intend, under the indemnification agreement, for defendant to bear the risk of loss for any accidents occurring due the sole negligence of plaintiff. Section 13–8–2(b) is simply not applicable where the parties contemplate insurance coverage, and the Court finds that the indemnification provision does not violate public policy. Accordingly, defendant's motion for summary judgement is **DENIED**.

**19.** Clearly, if the parties had included a term in the contract specifically requiring the insurance certificates to explicitly name plaintiff as being covered by the policy, the case would be identical to the cases cited by plaintiff. There is no such requirement in the contract, however. Hence, the Court must determine the intent of the parties. Because the contract explicitly requires defendant to undertake "contractual liability" coverage, the Court concludes that the parties explicitly intended, by the inclusion of this term, that any

### III. *Plaintiff's Motion for Partial Summary Judgment*

"Under Georgia law, if a party seeking to be indemnified had a complete defense to the underlying action, then a claim for indemnification cannot be maintained." Order [30] at 22 (citing *Foster v. Nix*, 173 Ga.App. 720, 727, 327 S.E.2d 833 (1985).) In its June 4, 1998 order, the Court noted, *sua sponte*, that the parties had insufficiently briefed the issue of what constitutes a "complete defense" to an underlying claim. Although not addressed by either party in their initial motions for summary judgment, the Court thoroughly discussed this issue in its June 4, 1998 order. In the order, the Court recognized that the Georgia courts had not defined the term "complete defense." Moreover, the Court discussed at length the policy considerations that supported the construction of the term complete defense as a defense as a matter of law as opposed to requiring the empaneling of a mock jury to try the underlying tort action to a sterile federal jury. Because plaintiff did not ask the Court to adopt a rule interpreting complete defense as a defense as a matter of law, the Court found "as they do not address this point, the cases cited by the parties do not contradict plaintiff's assumption that a jury trial may the appropriate way to determine the issue." [Order [30] at 31.]

Predictably, plaintiff raised this issue in the pretrial conference. (Pretrial Conf. [37] at 67–75.) In this conference, plaintiff requested permission to file a motion for

loss incurred pursuant to the contract be covered by insurance.

**20.** Defendant argues that section 26.4.1 specifically excludes liability for bodily injury or death. (Def.'s Supplemental Br. in Supp. of Mot. for Summ.J. [51] at 35.) This section, taken on its own, would support defendant's contention. Once again, however, defendant fails to take into account section 26.4.3 specifically requiring insurance coverage for "Contractual Liability."

partial summary judgment regarding what constitutes a "complete defense" under Georgia law. (*Id.* at 74.) The Court granted this request. This motion is presently before the Court.

■ In this motion, plaintiff contends that one has a complete defense only when one has a defense as a matter of law. Because the Court, in its June 4, 1998 order, determined that plaintiff did not have a defense as a matter of law to the underlying wrongful death action asserted by Ms. Powell, plaintiff argues that defendant should not be entitled to assert the factual defenses of assumption of risk and avoidance to the jury. Defendant, on the other hand, claims that a complete defense is one that would have prevailed either as a matter of law or at a jury trial. Hence, defendant argues that the defenses of assumption of risk and avoidance should go the jury, allowing the jury to determine if plaintiff would have been liable to Powell.

Upon review of the cases cited by the parties, and through an independent search of Georgia authority on its own, it is apparent that this issue is an issue of first impression under Georgia law. In *GAF Corp. v. Tolar Construction Co.*, 246 Ga. 411, 271 S.E.2d 811 (1980), the Georgia Supreme Court held that the defendant in a tort lawsuit must plead a statute of limitations defense in the original trial before being able to recover for indemnification against a third party in a subsequent trial. Relying on a Louisiana case, the court reasoned "[where] an action brought by an injured person against an alleged tortfeasor results in the alleged tortfeasor compromising the claim or being cast in judgment, no indemnification or contribution can be recovered by the party cast against a third party if the party cast had a defense available which would have defeated the action but failed to assert it." *Id.* 246 Ga. at 412, 271 S.E.2d at 812 (quoting *Jones v. Wright*, 258 So.2d 195, 197–98 (La.Ct.App.1972)).

Although this case sets out the rule that a complete defense defeats a claim for indemnification, the court does not define the term "complete defense" but rather holds that a statute of limitations defense must be pled in the underlying action because it was a defense "which would have defeated the action." Indeed, a statute of limitations defense is a defense as a matter of law and is not submitted to the jury, suggesting, without an explicit ruling, that the term "complete defense" could mean a defense as a matter of law. This conclusion, however, must be read in conjunction with the language of a subsequent Georgia Court of Appeals case.

In *Foster v. Nix*, 173 Ga.App. 720, 327 S.E.2d 833 (1985), the Georgia Court of Appeals reiterated the holding of *GAF Corp.* In *Foster*, the Georgia Court of Appeals stated that an indemnitor's obligation to indemnify applies unless the evidence "*demanded* a finding that there was a defense which would have defeated the claim." *Id.* 173 Ga.App. at 727, 327 S.E.2d at 839. (emphasis added.) This statement suggests that, absent the existence of a successful defense as a matter of law, the indemnitor cannot rely on the potential existence of a valid defense. Yet, this inference from the quoted statement is tempered by the fact that the defense in question was submitted to a jury, which concluded that the defense was without merit. *Id.* ("In such circumstances, the jury was authorized to find, as they did, that the right to indemnification had not been lost").

The remainder of the cases cited by the parties are not helpful to the analysis of what constitutes a "complete defense" under Georgia law. *See Southern Railway Co. v. Georgia Kraft Co.*, 823 F.2d 478 (11th Cir.1987); *Southern Railway Co. v. Brunswick Pulp & Paper Co.*, 376 F.Supp. 96 (S.D.Ga.1974); and *Union Camp Corp. v. Louisville & Nashville R.R. Co.*, 130 Ga.App. 113, 202 S.E.2d 508 (1973). Some of these cases are from other circuits and do not interpret Georgia law. *See Illinois Cent. Gulf R.R. Co. v. Int'l Paper*, 889 F.2d 536 (5th Cir.1989) (interpreting Mis-

sissippi indemnity law); *Missouri Pacific R. Co. v. Arkansas Oak Flooring Co.*, 434 F.2d 575 (8th Cir.1970) (applying Arkansas indemnity law); and *Chicago, R I & P R Co. v. Dobry Flour Mills*, 211 F.2d 785 (10th Cir.1954) (applying Oklahoma indemnity law).

Accordingly, the Court relies on the cases and policy rationale discussed in its previous order in determining that the term "complete defense" means a defense as a matter of law. As the Court has already determined that plaintiff did not have a defense as a matter of law to the underlying wrongful death action, plaintiff is entitled to summary judgment on this issue.

At this time, the Court notes that neither party has briefed the question of whether the issue of either party's negligence will be determined by the jury. At the pretrial conference and in its June 4, 1998 order, the Court confessed its uncertainty regarding how the issue of negligence would be framed at trial. Although not directly addressed in either party's motion for summary judgment, the Court has determined that the issue of either party's negligence will not be determined by the jury at all.

In *Southern Railway Co. v. Georgia Kraft Co.*, 823 F.2d 478 (11th Cir.1987), a panel of the Eleventh Circuit addressed an indemnification situation similar to the instant case. In *Southern Railway,* a railroad entered into a sidetrack agreement with Georgia Kraft. In this agreement, Georgia Kraft agreed to indemnify the railroad against "any and all damage resulting from the negligence of" Georgia Kraft. *Id.* at 479. While performing some work on Georgia Kraft's property, a railroad employee slipped and fell while mounting a train ladder. The employee slipped and fell, in part, due to the buildup of mud on Georgia Kraft's property resulting from a water overflow problem. The employee sued Georgia Craft in state court alleging that the mud he picked up while on Georgia Kraft's property caused him to fall. *Id.* The state court granted summary judgment in favor of Georgia Kraft. *Id.* at 480.

Subsequently, the employee sued the railroad under the Federal Employers' Liability Act (hereinafter "FELA"). The railroad advised Georgia Kraft that it intended to settle with the employee and offered Georgia Kraft the opportunity to settle or take over the defense of the case. Georgia Kraft did neither. After settling, the railroad sued Georgia Kraft pursuant to the indemnity agreement. The panel observed, "The fact that an indemnitee was potentially liable to an injured party is a necessary condition for the indemnitor to be liable to the indemnitee. Still, if the indemnitee reasonably settled with the injured party, but the injury is not covered by the indemnitee agreement, then the indemnitor is not liable to the indemnitee." *Id.* at 480–81. The panel then noted, in a footnote, that "[i]f the contract contemplated that Georgia Kraft would be liable for *any actions or omissions* that would make [the railroad] liable to railroad employees, our inquiry would end here. [The railroad's] settlement with [the injured employee] would determine both its liability under the FELA and Georgia Kraft's liability under the indemnity provision of the sidetrack agreement." *Id.* at 481 n. 4 (emphasis added).

In *Southern Railway,* the panel was forced to look more deeply into the indemnification agreement because, unlike the hypothetical in the footnote, the indemnification clause in that case only contemplated indemnification for injuries resulting from the "negligence of" Georgia Kraft. Hence, the panel held that the jury needed to determine two questions regarding Georgia Kraft's negligence. First "whether Georgia Kraft breached its common-law duty of care to [the injured employee]" and second, "whether that breach caused [the railroad] to be potentially liable (pursuant to FELA or otherwise) to [the injured employee]." *Id.* at 482. As with all indemnification obligations resulting from a

settlement, the jury also needed to determine whether the settlement was reasonable and entered into in good faith. *Id.*

■ The hypothetical situation in footnote 4 is precisely the situation presented in this case. The indemnity provision in the instant case contemplates that defendant would be liable for "any and all losses, claims, liens, demands and causes of action of every kind and character" regardless of who is determined to be at fault. As opposed to the situation in *Southern Railway,* the jury in the instant case does not need to determine whether either party was negligent and whether the negligence caused the injury. Rather, the settlement between plaintiff and Powell obviates the need to determine negligence, as the settlement presupposes that plaintiff was negligent. If defendant intended to challenge this determination,

then it could easily have intervened in the first action or objected to the settlement amount when notified of the settlement.[21]

Normally, the remaining jury question would be whether the settlement was reasonable and made in good faith. This determination, however, is also predetermined, as both parties have stipulated that the amount of the settlement and the amount of the attorney's fees expended in procuring the settlement were reasonable. (Pretrial Order [38] at 27.)

In sum, the indemnification agreement between the parties purports to indemnify plaintiff for the negligence of either party. Having determined, *supra,* that this provision is not void as a matter of public policy because of the insurance provisions in the contract, the Court has found that defendant must indemnify plaintiff for the inju-

---

**21.** In *Superior Rigging & Erecting Co. v. Ralston Purina Co.,* 172 Ga.App. 79, 322 S.E.2d 95 (1984), Superior contracted to construct a catwalk in Ralston's plant. In the construction contract, Superior agreed to indemnify Ralston against any liability caused by any act or omission of Superior. One of Superior's employees, while working on the project, was seriously injured by a twenty-foot fall to a concrete floor. *Id.* 172 Ga.App. at 81, 322 S.E.2d at 96. The employee, after collecting worker's compensation from Superior, sued Ralston in tort. After extensive discovery, the case went to trial, but before the case could be determined by a jury, the injured worker dismissed the case. Prior to the expiration of the time that the injured worker could recommence his claim against Ralston, the parties settled the case for considerably less than the potential damages available to worker. *Id.* Ralston attempted to collect the settlement amount from Superior, but Superior denied liability for indemnification. Accordingly, Ralston brought a lawsuit to collect the settlement amount pursuant to their contractual provision. The trial court granted partial summary judgment to Ralston, determining that Superior was liable as a matter of law under the indemnity provision in the contract. *Id.*

The Georgia Court of Appeals found that the trial court had erred in granting partial summary judgment to Ralston. The court held that "the burden was on [Ralston], as movant for summary judgment, to establish that Land's injury was proximately caused, at

least in part, by appellant's negligence." *Id.* 172 Ga.App. at 80, 322 S.E.2d at 97. The Court, after analyzing the facts adduced in the prior action, determined that a genuine issue of material fact remained as to whether Superior was negligent, and as such, whether Superior was required under the indemnification provision to indemnify Ralston for its settlement. *Id.* 172 Ga.App. at 81, 322 S.E.2d at 97.

Although factually similar, *Superior Rigging* is distinguishable from the instant case. As discussed above, the indemnification provision in *Superior Rigging* required Superior to indemnify Ralston for claims resulting only from Superior's negligence and not Ralston's negligence. In the settlement, Ralston was admitting its own negligence and did not even address Superior's possible negligence. In this case, the indemnification provision between the parties mandates that defendant indemnify plaintiff for any claim, regardless of who is deemed negligent. As such, by settling the underlying tort action with Powell, plaintiff admitted its own negligence, thereby triggering the duty of defendant to indemnify plaintiff pursuant to their contract. Defendant had the opportunity in state court to contest plaintiff's negligent by defending the action on plaintiff's behalf or by proceeding with a declaratory judgment action. Instead, defendant did not challenge the settlement, waiving its right to challenge plaintiff's admission of negligence in the underlying tort action.

ry to Powell regardless of who was determined to be at fault for the injury, as long as plaintiff did not have a "complete defense" to the underlying tort action. As discussed *supra*, the Court has determined two relevant issues: (1) that the term "complete defense" means a defense as a matter of law and (2) that plaintiff would not have succeeded in defending the underlying wrongful death action, utilizing the defenses of assumption of risk or avoidance, as a matter of law. Accordingly, defendant must indemnify plaintiff for the settlement amount if the jury determines that a contract existed between the parties and that the contract contained an indemnification agreement, as discussed *supra*. The jury will not determine any issues of negligence or causation, as the unchallenged settlement between plaintiff and Powell forecloses any such inquiry.

## CONCLUSION

For the foregoing reasons, defendant Harbert–Yeargin, Inc.'s Supplemental Brief in Support of its Motion for Summary Judgment [51] is **DENIED** and plaintiff's Motion for Partial Summary Judgment [47] is **GRANTED**.

SO ORDERED.