**SOUTHERN GUARANTY INSURANCE COMPANY, Plaintiff-Appellee,**

v.

**ZANTOP INTERNATIONAL AIRLINES, INC., and Puritan Insurance Company, and Warren Associates, Inc., Defendants-Appellants.**

No. 84–8696.

United States Court of Appeals, Eleventh Circuit.

Aug. 2, 1985.

Richard A. Marchetti, Max R. McGlamry, Columbus, Ga., for Warren.

Glover McGhee, Atlanta, Ga., for Puritan and Zantop.

Bruce Benton, Macon, Ga., for plaintiff-appellee.

Before RONEY and HILL, Circuit Judges, and PITTMAN *, District Judge.

JAMES C. HILL, Circuit Judge:

This diversity case arises from a declaratory judgment action brought in the district court by Southern Guaranty Insurance Company ("Southern Guaranty") against various defendants, all of whom are claimants in an underlying action for reimbursement under the terms of an insurance policy issued by Southern Guaranty. The dis-

trict court granted summary judgment in favor of Southern Guaranty, finding that coverage under the contested policy did not extend to the losses sustained by the defendants. Defendants appeal; we affirm.

In September, 1979, the Macon-Bibb County Industrial Authority contracted with Warren Associates, Inc. ("Warren"), as general contractor, for the construction of a pre-engineered metal aircraft hangar and associated site improvements at the Wilson Airport in Macon, Georgia. Warren in turn subcontracted with Southeastern Building Services ("Southeastern") for the installation of the hangar. A provision of the subcontract provided that Southeastern indemnify Warren against claims for damages arising from accidents to persons or property occasioned by Southeastern. Southeastern was accordingly responsible for defense of all suits brought against Warren by virtue of that indemnity. The subcontract also provided that Southeastern should carry public liability insurance in force until the completion of its work.

Southeastern obtained public liability insurance from Southern Guaranty for the period January 1, 1980, to January 1, 1981. This policy was renewed on January 1, 1981, and it remained in effect until, at the latest, December 31, 1981.[1]

The hangar construction was completed during 1980. The Macon-Bibb County Industrial Authority then permitted Hawaiian Airlines to take possession of the hangar facility pursuant to a lease agreement between the Industrial Authority and the airline. Hawaiian Airlines subsequently subleased the hangar facility to Zantop International Airlines, Inc. ("Zantop"). Zantop thereafter occupied the hangar facility.

On March 21, 1982, the hangar structure collapsed during a windstorm, causing substantial damage to airplanes and other property owned by Zantop. Zantop and its insurer, Puritan Insurance Company ("Pu-

---

\* Honorable Virgil Pittman, U.S. District Judge for the Southern District of Alabama, sitting by designation.

1. An issue existed as to whether the policy was cancelled earlier because of nonpayment of premium. Our resolution of the case makes this issue irrelevant.

ritan"), filed an action in the United States District Court against various defendants, seeking reimbursement for losses suffered upon the hangar collapse. Liability was grounded upon the alleged joint and several negligence of those defendants in the erection of the hangar. Warren asserted a cross-claim against Southeastern, contending that Southern Guaranty and Southeastern were obligated, under the terms of the indemnity agreement between Southeastern and Warren, to defend any suit and pay any judgment arising against Warren in the action.

Southern Guaranty filed this declaratory judgment action in United States District Court seeking an adjudication of no coverage with respect to the March 1982 hangar collapse damage under the policy issued by Southern Guaranty to Southeastern.

On cross motions for summary judgment, the district court reviewed the insurance policy in question and determined as a matter of law that there was no coverage provided by the Southern Guaranty policy against losses resulting from the hangar collapse, and granted summary judgment for Southern Guaranty. Defendants appeal from that judgment. We review to determine if coverage existed.

## I. THE TERMS OF THE POLICY

The appellants seek to establish coverage on the basis of two provisions of the insurance contract, the "completed operations hazard," and "contractual liability" coverage. Because these sections incorporate terms defined in other sections of the insurance policy, we review the policy in its entirety.

The policy was divided into two sections: Section I set out property coverage of the insured; Section II set out liability coverage. Page four of the contract was a broad form property damage endorsement with a completed operations provision. This endorsement applied exclusively to liability coverage. Page six of the contract was a comprehensive liability insurance form which contained schedules of insurance coverage and premium costs. The completed operations sections of this schedule set out the receipts upon which completed operations coverage premiums would be determined. Pages seven and eight of the contract set out the contractual liability provisions and exclusions applicable exclusively to Section II, liability insurance. Finally, appended to the contract was a six-page general conditions form applicable both to the property and liability sections of the policy. Set out in this form was a section entitled "Definitions Applicable To Section II."

Under present facts the pertinent provisions of the policy stated that the insurer agreed to

> pay on behalf of the *insured* all sums which the *insured,* by reason of *contractual* liability assumed by him under any written contract of the type designated in the schedule for this insurance, shall become legally obligated to pay as damages because of *bodily injury* or *property damage* to which this insurance applies, caused by an *occurrence,* and the company shall have the right and duty to defend any *suit* against the *insured* seeking damages on account of such *bodily injury* or *property damage,* even if any of the allegations of this *suit* are groundless, false or fraudulent...."

Additionally, the insurance policy contemplated "completed operations coverage" and defined that coverage. Definitions were then set out.

> *'Contractual liability'* means liability expressly assumed under a written contract or agreement, provided, however, that *contractual liability* shall not be construed as including liability under a warranty of the fitness or quality of the *named* insured's products or a warranty that work performed by or on behalf of the named insured will be done in a workmanlike manner;

> \* \* \* \* \* \*

> *'Property damage'* means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at

any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period;

\* \* \* \* \* \*

[Occurence means] an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected or intended from the standpoint of the insured;

\* \* \* \* \* \*

'Completed operations hazard' includes bodily injury and property damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the named insured.

## II. CONSTRUCTION OF THE CONTRACT

The question of coverage turns upon whether the general contractual liability provision or the completed operations clause contemplated damage occurring beyond the policy period. In making this determination we apply Georgia law.

### A. Coverage Under the Contractual Liability Provisions

■ Appellants argue that the policy contemplated coverage of their losses un-der its contractual liability provisions. Alternatively, the appellants argue that the contractual liability provisions were ambiguous and must therefore be construed against Southern Guaranty resulting in a determination of coverage.[2]

The subcontract between Warren and Southeastern required the subcontractor to carry public liability insurance and to furnish the contractor evidence that such insurance was obtained and in force until the completion of the contract. Southeastern did obtain general liability insurance,[3] as modified by additional hazard schedules, and the agent of Southern Guaranty issuing the policy furnished a certificate to Warren describing the insurance coverage.

The policy provided that Southern Guaranty would pay on behalf of Southeastern "all sums which the insured, by reason of contractual liability assumed by him under any written contract of the type designated in the schedule for this insurance, shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence...." Contractual liability was in turn defined to exclude warranties as to the quality of the product and warranties that work would be performed in a workmanlike manner.

This coverage thus provided against contingent damage occurring during the course of the insured's or another's performance of contractual duties. It was not

2. This is our best approximation of the appellants' argument. Nowhere in the briefs is a distinction drawn between completed operations coverage and contractual liability coverage. However, at oral argument attorneys for the appellants acknowledge that their claim rested primarily upon contractual liability coverage contained in the policy.

3. A general liability policy purports to insure only against liability imposed by law. The bargain between insured and insurer does not contemplate liabilities assumed by the insured through his own agreement. However, such voluntary and additional liabilities can give rise to an insurable interest and, on payment of an additional premium, may be insured. For example, just as an insured may obtain coverage for his own legal liability, he may agree to indemnify another against liability imposed upon that other by law and obtain insurance coverage to provide against that contingency. This circumstance arises frequently in the relationship between a contractor and a subcontractor. Alternatively or, it may be, additionally, an insured may by contract assume liabilities more extensive than those imposed upon him by law and he may obtain coverage against that contingency as well. An example of such circumstance would be a bailee's agreement with a bailor to hold the bailor harmless for any damage to the property in bailment regardless of whether that damage was a result of the negligence of the bailee, accident, or other cause. Contractual liability insurance may mean either or both of these things.

intended to insure against breaches of the assumed contractual duties themselves or against negligent performance of those duties.[4] Any "contractual liability" of Southeastern for the hangar collapse would of necessity arise from Southeastern's negligence in the hangar's construction, that is from a breach of a warranty of fitness or that work would be performed in a workmanlike manner. That kind of "contractual liability" was expressly excluded from coverage by Southern Guaranty and we therefore find that Southern Guaranty is not liable under the appellants' "contractual liability" argument.[5]

### B. Completed Operation Coverage

If there is liability, it must therefore arise under completed operations coverage. Completed operations coverage, typically referred to in comprehensive liability policies as "completed operations hazards," includes within its scope protection against "injury or damage which occurs (1) away from premises owned or controlled by the insured, and (2) after the insured's operations as to a particular activity have been completed or abandoned." Annot. 58 A.L.R.3d 12, 18 (1974). As such, in the context of a building contractor's liability protection, completed operations coverage is an approximate analogue to products liability insurance for the manufacturer of goods. See Nielson v. Travelers Indemnity Co., 174 F.Supp. 648, 652–53 (N.D.Iowa 1959). Completed operations coverage arose in response to the general rule that an independent contractor is relieved of responsibility for a structure erected by him after that structure is completed and occupied by its owner. Nielson, 174 F.Supp. at 652. It is distinct from "premises-operations" coverage, which insures against damage arising from the ongoing activities of the operation of a particular business, 58 A.L.R.3d at 20, see also Henderson, Insurance Protection for Products Liability and Completed Operations—What Every Lawyer Should Know, 50 Neb.L.Rev. 415 (1971), and from "builders risk" coverage which insures the contractor's interest in the structure he is erecting, see Annot. 94 A.L.R.2d 221, 224 (1964). As is true with its products liability insurance counterpart, completed operations coverage is purchased on a period by period basis to protect against liability for harms occurring during that period. The time at which the negligent act causing the harm was committed is immaterial because the harm in question is physical damage itself, not its cause. As stated in Appleman, "the focus is on the loss and not on the conduct that may have precipitated the loss." 7A Appleman, Insurance Law and Practice § 4497 (W. Berdal ed. 1979).[6]

The damage giving rise to this litigation occurred well beyond the end of the policy period. Accordingly, under the generally accepted construction of completed operations insurance, and under the policy itself, there would be no coverage. While the parties in this case have been unable to

---

**4.** We might speculate whether the relationships between the parties in this case actually or even potentially presented the kinds of risks for which the insured obtained coverage—the parties have not advised us of these relationships.

**5.** There is, of course, an alternative rationale upon which a decision in this case could be based. That is that contractual liability coverage, like completed operations coverage discussed infra, depended for its construction upon the definition of property damage contained within the contract of insurance. Property damage was limited by definition to damage occurring during the policy period. As the instant damage occurred beyond that period, there would be no coverage because there would be no property damage within the meaning of the insurance contract.

**6.** To illustrate, a building erected prior to the policy period which collapses during the term of the policy may give rise to a covered claim. Conversely, a building erected during the policy period collapsing after the policy expires cannot give rise to a covered claim. Cf. Long, Products Liability Insurance § 11.02 at 11–12–5 n. 2 (in the analogous products liability context). The rationale underlying this rule is easily discerned. Any other result would create coverage without end. See Singsaas v. Diederich, 307 Minn. 153, 238 N.W.2d 878 (1976). Additionally, we note that the policy itself created a similar limitation by defining "property damage" as harm occurring during the policy period.

guide us to a Georgia case on point and while our own research has been unable to unearth such a case, we have no doubt that the Georgia courts would reach this result. We therefore hold that the completed operations provisions of the insurance policy under consideration did not cover Southeastern's potential liability for damage occurring as a result of the hangar collapse because that damage arose beyond the policy period.

### III. SUMMARY

In summary we hold that the contract of insurance between Southern Guaranty and Southeastern did not cover the losses caused by the hangar collapse. The contractual liability argument is untenable. The completed operations argument is also without merit. Accordingly, the judgment of the district court is

AFFIRMED.