[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 13-11342
_____

D.C. Docket No. 3:08-cv-00538-HES-TEM


ATLANTIC MARINE FLORIDA, LLC,
as successor in interest to Atlantic Marine, Inc.,
AMERICAN HOME ASSURANCE COMPANY,
as Subrogated Underwriter,

Plaintiffs - Appellees
Cross Appellants,

versus

EVANSTON INSURANCE COMPANY,

Defendant - Appellant
Cross Appellee,

HARTFORD CASUALTY INSURANCE COMPANY,

Defendant.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____
(December 24, 2014)

Before TJOFLAT, COX, and ALARCÓN,[*] Circuit Judges.

TJOFLAT, Circuit Judge:

In this case, a marine engineering firm purchased an architect's and engineer's professional liability insurance policy, which insured the firm against any liability it might incur in a tort action for the negligent preparation of working drawings used to build an oceangoing passenger vessel. After the vessel was launched and in operation, a tragic accident occurred when the bulkhead door in the vessel's forward engine room malfunctioned, causing the death of the ship's captain. The captain's personal representative, claiming that the engineering firm and the shipbuilder were independently at fault, brought an action against them in state court. Pursuant to the insurance policy, the insurance company provided the engineering firm a defense. The shipbuilder demanded that the insurance company provide it a defense as well, but the insurance company refused to do so on the ground that the policy did not cover the shipbuilder as an insured. The insurance company having denied coverage, the shipbuilder turned to its own insurance company for a defense. Its insurer had issued the shipbuilder a comprehensive

---

[*] Honorable Arthur L. Alarcón, Senior U.S. Circuit Judge for the Ninth Circuit, sitting by designation.

2

marine liability policy, which insured the shipbuilder against any liability it might incur in a tort action based on its own negligence.

After the two insurance companies separately settled with the personal representative, the shipbuilder and its comprehensive marine liability insurer brought this declaratory judgment action against the company that insured the engineering firm.  The insurer sought reimbursement of the expenses incurred defending the shipbuilder, as well as the settlement monies it paid the personal representative.  The District Court concluded that although the shipbuilder was not a named insured under the engineering firm's insurance policy, it was a third-party beneficiary of the insurance the policy provided.  Thus, the court held, the shipbuilder was entitled to the same rights the policy afforded the policy's named insured, the engineering firm.  The insurance company appeals the judgment.  We reverse.

## I.

### A.

The engineering firm is Guido Perla & Associates ("GPA").  In April 1998, GPA, pursuant to a contract with Delta Queen Steamboat Company ("Delta Queen"), began preparing the specifications and guidance drawings to be used in

3

the construction of two passenger vessels, the Cape May Light and the Cape Cod Light.[1]  As this preparation was underway, Delta Queen assigned the contract to Coastal Queen Holdings, LLC ("Coastal Queen"), which then, on May 1, 1999, entered into an agreement with Atlantic Marine, Inc. ("AMI")[2] to construct the two vessels in accordance with GPA's guidance drawings.[3]  Doc. 56-8, at 3.[4]

On January 12, 2000, AMI entered into a contract with GPA ("the AMI-GPA Agreement" or "the Agreement") under which GPA agreed to complete on behalf of AMI the design and engineering services called for by GPA's contract with Delta Queen.  GPA agreed to do so "in a manner . . . consistent with all appropriate professional standards."  Doc. 1-2, ¶ 2, at 2.  The Agreement required GPA to obtain four separate forms of insurance.  Two are relevant here:  one

---

[1]  The vessel involved in the instant case was the Cape May Light.

[2] Atlantic Marine Florida, LLC, brought the complaint in this case as successor in interest to Atlantic Marine, Inc.

[3]  The Coastal Queen-AMI contract provided that AMI would construct and outfit the vessels, provide design and engineering services as necessary, and complete "all work necessary to construct, test and deliver each Vessel in accordance with the" guidance drawings as prepared by GPA.  Doc. 56-8, at 3.  The contract referred to GPA as "[AMI]'s engineering subcontractor." Doc. 56-8, at 32.  Coastal Queen and AMI agreed that GPA's guidance drawings would be revised to conform to the vessels' specifications. Id. at 6, 24.  As indicated in the following text, AMI then contracted with GPA to provide the design and engineering services required for the construction of both vessels.  The record does not indicate whether any of the provisions of GPA's contract with Delta Queen pertaining to specifications and guidance drawings were incorporated by AMI's contract with GPA, or, if so, which provisions were incorporated.

[4]  Unless otherwise noted, all docket citations refer to the District Court docket, Atl. Marine Fla., LLC v. Evanston Ins. Co., No. 3:08-cv-00538 (M.D. Fla.).

4

would provide comprehensive general liability ("CGL") insurance; the other would

provide architect's and engineer's professional liability ("A&E") insurance.[5]  GPA

would be the "named insured" in both policies, whereas AMI would be designated

an "additional insured" in only the CGL policy.  GPA obtained a CGL insurance

policy from The Hartford Casualty Insurance Company ("Hartford"), but AMI was

---

[5] The full text of the relevant provisions of the AMI-GPA Agreement is as follows:

8. Insurance.

a) GPA shall take out, carry and maintain with insurance company or companies, and in policies of insurance acceptable to AMI, the following insurance with limits not less than indicated for the respective items:

. . . .

(2)  Comprehensive General Liability Insurance, including contractual liability, and products completed operations liability with waiver of subrogation in favor of AMI with limits not less than $2,000,000.00 bodily injury and property damage combined, each occurrence and aggregate.  Such insurance must cover AMI as an additional insured and the policy shall contain the following language: "Naming AMI as an additional insured shall not prevent recovery in any situation in which recovery would have been available had AMI not been named an additional insured."

. . . .

(4)  Architect's and Engineer's Professional Liability Insurance from Evanston Insurance Company on a claims made basis with limits not less than $5,000,000.00 covering both vessels with defense costs in addition to the policy limits and with a $25,000.00 per vessel deductible. . . . Such Architect's and Engineer's Professional Liability Insurance shall contain coverage for breach of contract for errors, omissions or negligent acts.  While GPA will be named insured, AMI agrees to pay the premium for this Architect's and Engineer's Professional Liability Insurance directly to Evanston Insurance Company on behalf of GPA.

Doc. 1-2, at 5 (emphasis added).  Although paragraph (2), unlike paragraph (4) contains no reference to GPA as the "named insured," by specifying that GPA would take out the insurance and that AMI must be covered as a named inured, the parties implicitly agreed that GPA would be the named insured.

5

not added as an additional insured.[6]  The policy covered GPA for its liability to third parties for personal injuries caused by its negligence.[7]  It specifically excluded from coverage, however, liability resulting from its negligence in performing professional services.[8]  GPA obtained an A&E insurance policy from Evanston Insurance Company ("Evanston").[9]  The policy covered GPA for its liability to third parties for personal injuries caused by its negligence in performing professional services—the coverage the CGL policy specifically excluded.

## B.

The Cape May Light was christened in Alexandria, Virginia, in April 2001.  Later that year, on October 27, the ship was berthed in Green Cove Springs in Clay County, Florida, in anticipation of an extended lay-up period.  At approximately

---

[6] The policy's coverage began on April 1, 2001, and was extended retroactively.  For business liability, the retroactive date was April 1, 1999.  Doc. 1-3, at 5.  For employee-benefits liability, it was April 1, 1998—approximately the date GPA began its work under its contract with Delta Queen.  Id.  It appears from the record that AMI was not named an additional insured due to GPA's error.

[7] In the words of the policy, "sums that the insured becomes legally obligated to pay as damages because of 'bodily injury'" caused by "an accident."  Doc. 1-3, at 19, 38.

[8] The policy excluded from coverage "'bodily injury' . . . arising out of the rendering or failure to render any professional services by or for [the Named Insured], including (1) [t]he preparing, approving, or failing to prepare or approve . . . designs and specifications; and (2) [s]upervisory, inspection, or engineering services."  Doc. 1-3, at 41.

[9] GPA obtained the policy on November 9, 1999, approximately two months before its contract with AMI was finalized.  The policy's coverage extended retroactively for claims made on the basis of GPA's acts, errors, or omissions in the rendering of professional services on or after April 1, 1998.  After the AMI-GPA Agreement was finalized, GPA extended the term of the policy as required by the Agreement.

6

4:30 P.M., the ship's captain, Charles Beverly, and the port engineer were in the forward engine room.  At one end of the room was a watertight forward bulkhead door, which was designed to shut automatically upon the loss of power.  The port engineer left the room to secure the port fueling station, leaving Captain Beverly to cut the ship's power and disconnect its battery terminals.  After Captain Beverly did this, he became trapped in the forward bulkhead door in a position that prevented rescuers from accessing its emergency release mechanism.  By the time help arrived, he had died from compression asphyxiation.[10]

## C.

On October 25, 2002, Captain Beverly's personal representative, Ann Beverly ("Beverly"), filed a wrongful-death action against IMUSA,[11] GPA, and AMI in the Fourth Judicial Circuit Court of Florida.[12]  As amended, her complaint alleged that the bulkhead door that caused Captain Beverly's death was designed

---

[10] U.S. Coast Guard, Investigation Activity Report, Case No. 138905 (Oct. 27, 2001), available at https://cgmix.uscg.mil/iir; see also Veronica Chapin, Law & Disorder: Ortega River Boat Crash Kills Man, Fla. Times-Union (Oct. 30, 2001), http://jacksonville.com/tu-online/stories/103001/met_7686508.html; Ship's Master Killed by Door, Prof. Mariner Mag. (Mar. 2, 2007, 12:00 AM), http://www.professionalmariner.com/March-2007/Ships-master-killed-by-door.

[11] IMUSA is the trade name of Project and Construction Welding, Inc., the manufacturer of the watertight door.

[12] Beverly also sued American Classic Voyages, Co.; Delta Queen Steamboat Company; Delta Queen Coastal Voyages, LLC.; and Cape May Light, LLC.  We make no further reference to these defendants because the claims lodged against them are not pertinent here.

and manufactured by IMSUA and installed by AMI, and that GPA designed the Cape May Light, including the system of which the bulkhead door was a part. The complaint contained separate claims of strict liability and negligence against IMUSA (Counts I and II), AMI (Counts III and IV), and GPA (Counts V and VI). The claims of strict liability against IMUSA, AMI, and GPA were materially identical: the bulkhead door, Beverly alleged, was defective and unreasonably dangerous because it had been designed and manufactured so that a person caught or trapped in the door could not reach or activate a release mechanism to disengage or release it.[13] The claims of negligence against the three defendants were also materially identical, except that IMUSA was charged with negligence in designing and manufacturing the door, AMI was allegedly negligent in manufacturing and installing the door, and GPA was allegedly negligent in designing the watertight door and the system of which it was a part so that a person caught or trapped in the door could not activate a release mechanism to disengage or release the door.[14]

In February 2003, AMI demanded that GPA or its insurers, Evanston and

---

[13] Alternatively, the complaint alleged, the bulkhead door was defective and unreasonably dangerous because it either lacked a device to prevent the door from accidentally trapping someone using it, or it lacked adequate warnings. These theories of liability were reproduced in essentially identical form in each count. The complaint extended its allegations of strict liability to GPA on the basis of GPA's designing the Cape May Light to include the door.

[14] Each count also alleged that each party was negligent in failing to adequately test, inspect, and post warnings about the dangers of the watertight door.

8

Hartford, provide it with a defense to the claims of strict liability and negligence.[15]

AMI contended that Evanston was obligated to provide it with a defense under

GPA's A&E policy because (1) Beverly's claims were based on GPA's negligence

in furnishing the design and engineering services for the Cape May Light, and (2)

GPA had promised, in the AMI-GPA Agreement, that any liability AMI incurred

due to such negligence would be borne by Evanston under the A&E policy.  AMI

contended that Hartford was obligated to provide it with a defense under the

GPA's CGL policy because it was an "additional insured."

Evanston rejected AMI's demand on multiple grounds.  First, since AMI

was neither a named nor an additional insured in the A&E policy, it was not

contract-bound to provide AMI with a defense.  Second, AMI was being sued for

its own negligence, not GPA's, and the policy did not provide coverage for AMI's

negligence.  Finally, AMI could not recover under the policy unless and until it

obtained a judgment against GPA establishing that GPA's negligent performance

---

[15] We note in passing that on November 7, 2001, just weeks after Captain Beverly's death, AMI commenced arbitration proceedings against GPA, alleging breach of contract, breach of implied warranty, and negligence, as well as a right to contractual indemnification arising from the design and manufacture of the Cape May Light. Doc. 56-7, at 3. AMI's statement of its claim in the arbitration proceeding appears to be unrelated to Beverly's wrongful-death action. See Statement of Claim, Atl. Marine, Inc. v. Guido Perla & Assocs., at 2–4 (Miami Mar. Arb. Council Nov. 7, 2001). After an arbitration panel convened, the arbitration proceedings were held in abeyance. Doc. 56-7, at 3 & n.1. Counsel for GPA noted in an affidavit that the arbitration was eventually dismissed with prejudice. Doc. 56-5, at 2.

of professional services caused Captain Beverly's death.  Hartford also rejected

AMI's demand.  Although the record does not disclose the reasons for Hartford's

rejection, it appears that Hartford's position was that AMI was neither a named nor

an additional insured under GPA's CGL policy; moreover, the policy excluded

coverage for GPA's negligent performance of professional services.

Evanston provided a defense for GPA as required by the A&E policy.

American Home Assurance Company ("American Home"), AMI's comprehensive

marine liability insurer, provided AMI's defense.  In their answers to the Beverly

complaint, both AMI and GPA denied the allegations of wrongdoing.  Then, after

the parties had joined issue, AMI moved the court for leave to file a cross-claim

against GPA.  The proposed cross-claim sought indemnification from GPA for any

damages it might have to pay Beverly due to GPA's negligence in designing or

engineering the bulkhead door.

The motion was still pending when Evanston and American Home

separately settled Beverly's claims against their respective named insureds, GPA

and AMI.[16]  After learning that American Home was negotiating a settlement of

---

[16] See Doc. 56-6; see also Affidavit of Alan Fiedel ¶ 6, Doc. 56-5 (noting that this motion was never heard); Docket, Beverly v. Project & Constr. Welding, Inc., No. 03-CA-001121 (Fla. 4th Cir. Ct.) (reflecting the same).  The record does not disclose whether AMI sought leave to file a cross-claim against IMUSA for indemnification on the ground that

10

Beverly's claims against AMI, see Doc. 56-5, at 3, Evanston settled the claims against GPA in June 2007 for approximately $300,000.  Soon thereafter, American Home settled the claims against AMI for $325,000.

### D.

After these settlements were reached, AMI and American Home brought this declaratory judgment action against Evanston and Hartford.[17]  AMI sought a declaration that both insurers had a duty to defend it against Beverly's claims; American Home, which provided AMI a defense, sought reimbursement of the expenses it incurred in doing so and the $325,000 it paid Beverly, as well as attorney's fees incurred in prosecuting the complaint in the instant case and costs.[18]

---

IMUSA, in manufacturing the bulkhead door, created the defective and unreasonably dangerous condition described in Counts III and IV of  Beverly's complaint.

[17]  AMI and American Home invoked the District Court's diversity jurisdiction under 28 U.S.C. § 1332, its admiralty and maritime jurisdiction under 28 U.S.C. § 1333, and the Declaratory Judgment Act, 28 U.S.C. § 2201.  The District Court had jurisdiction under §§ 1332 and 1333, but not § 2201, because the Declaratory Judgment Act does not provide the federal courts with subject matter jurisdiction.  Stuart Weitzman, LLC v. Microcomputer Res., Inc., 542 F.3d 859, 861–62 (11th Cir. 2008).

[18]  The complaint also sought a declaration that Evanston breached a contract with AMI when it failed to seek AMI's consent before settling the Beverly estate's claim against GPA. This claim was based on Endorsement No. 7 of the A&E policy, which provided that Evanston

shall not settle any Claim without the consent of [AMI].  If, however, [AMI] shall refuse to consent to any settlement recommended by [Evanston] and shall elect to contest the Claim or continue any legal proceedings in connection with such Claim, then the Liability of [Evanston] for such Claim shall not exceed the sum of (1) the amount for which such Claim could have been so settled plus (2) Claims Expenses incurred up to the date of such refusal.

11

Evanston, in response, sought contrary declarations, including that (1) the claims Beverly's complaint asserted against AMI were not covered under the A&E policy, and, for that reason, AMI was not entitled to a defense; and (2) American Home, as AMI's subrogee, could not recover under the A&E policy because AMI had not obtained a judgment against GPA based on GPA's negligence in designing the bulkhead door that malfunctioned.

On cross-motions for summary judgment, the District Court found that AMI was a third-party beneficiary under the insurance contract between Evanston and GPA. The policy therefore provided AMI coverage for the claims Beverly asserted against it and obligated Evanston to provide it with a defense against Beverly's claims.[19] Nonetheless, after an abortive appeal by Evanston to this Court,[20] the District Court denied American Home's claim for reimbursement of the expenses it

Doc. 1-2, at 20. The District Court held that though Endorsement No. 7 indeed required Evanston to notify and obtain AMI's consent before settling claims, AMI could not succeed in its claim because it failed to adequately plead damages. Doc. 88, at 7–8. AMI has not cross-appealed the court's ruling.

[19] The District Court also held that despite GPA's failure to list AMI as an additional insured on the Hartford CGL policy, AMI was an additional insured by virtue of its promise in the AMI-GPA Agreement to obtain CGL insurance. Id. at 12–13 & n.3. The court concluded, however, that Hartford had no duty to defend or indemnify AMI under the policy because the policy expressly excluded from its coverage liability for bodily injury resulting from GPA's provision of engineering services. Id. at 14–15. AMI has not appealed this ruling.

[20] We dismissed Evanston's prior appeal for want of jurisdiction, Atl. Marine Fla., LLC v. Evanston Ins. Co., No. 10-13458 (11th Cir. July 21, 2011) (per curiam), as we did AMI's associated motion for appellate fees and costs and to transfer to the District Court, id. (Dec. 2, 2011).

incurred in providing AMI a defense.  It did so on the grounds that American Home also had a duty to defend AMI, and that "[c]ontribution is not allowed between insurers incurred in defense of a mutual insured."  Doc. 159, at 4–5 (quoting Argonaut Ins. Co. v. Md. Cas. Co., 372 So. 2d 960, 963 (Fla. 3d Dist. Ct. App. 1979).[21]  The court ultimately entered judgment for American Home in the amount of $622,131.32.  The District Court arrived at this figure by adding the amount American Home paid Beverly in settlement, $325,000; attorney's fees under Florida Statute § 627.428 in the sum of $164,305.26;[22] $132,014.56 in prejudgment interest; and costs in the amount of $811.50.  Evanston now appeals the District Court's declaratory judgment and the court's award of attorney's fees

---

[21]  The court rejected an exception to the Argonaut rule that applies "when the obligation to indemnify has been transferred completely from one insurer to another pursuant to an indemnification agreement between the insured parties."  Doc. 159, at 5–6 (citing Cont'l Cas. Co. v. City of S. Daytona, 807 So. 2d 91, 93 (Fla. 5th Dist. Ct. App. 2002).

[22]  Florida Statutes § 627.428 states, in pertinent part:

> (1) Upon the rendition of a judgment or decree by any of the courts of this state against an insurer and in favor of any named or omnibus insured . . . , the trial court . . . shall adjudge or decree against the insurer and in favor of the insured . . .  a reasonable sum as fees or compensation for the insured's or beneficiary's attorney prosecuting the suit in which the recovery is had.
>
> . . .
>
> (3) When so awarded, compensation or fees of the attorney shall be included in the judgment or decree rendered in the case.

The amount of attorney's fees consisted of the sum of $125,790 for the period of time prior to the district court's grant of summary judgment in the declaratory judgment action and $38.515.26 for the work completed following its grant of summary judgment.  Because of the way we resolve this appeal, we do not address the District Court's holding that AMI was an "omnibus insured" entitled to attorney's fees in this declaratory judgment action pursuant to § 627.428.

13

and costs to American Home.

## II.

This appeal presents two issues.  The first is whether, under the terms of the A&E policy, including its endorsements, Evanston was obligated to provide AMI a defense in the Beverly lawsuit.  Evanston was obligated to do so if the allegations underpinning Beverly's claims came within the coverage the policy provided.  See Jones v. Fla. Ins. Guar. Ass'n, 908 So. 2d 435, 442–43 (Fla. 2005) ("It is well settled that an insurer's duty to defend its insured against a legal action arises when the complaint alleges facts that fairly and potentially bring the suit within policy coverage."). [23]  The second issue is whether the A&E policy obligated Evanston to pay American Home, as AMI's subrogee, the price of its settlement with Beverly.

## A.

Evanston was not obligated to provide AMI a defense in the Beverly lawsuit

---

[23]  The proper interpretation of the A&E policy's insuring agreement or any other relevant policy provision poses a question of law.  The parties agree that Florida law governs, and the District Court applied it.  Under Florida law, ordinary principles of contract interpretation govern the interpretation of an insurance policy.  Intervest Constr. of Jax, Inc. v. Gen. Fid. Ins. Co., 133 So. 3d 494, 497 (Fla. 2014).  We read the policy's provisions as a whole, not in isolation, Harrington v. Citizens Prop. Ins. Corp., 54 So. 3d 999, 1004 (Fla. 4th Dist. Ct. App. 2010) (citing, e.g., Swire Pac. Holdings, Inc. v. Zurich Ins. Co., 845 So. 2d 161, 166 (Fla. 2003); Auto-Owners Ins. Co. v. Anderson, 756 So. 2d 29, 34 (Fla. 2000)), and we construe terms according to their plain meaning, Garcia v. Fed. Ins. Co., 969 So. 2d 288, 291 (Fla. 2007).  We have approached the interpretation of the relevant A&E policy provisions in accordance with these principles.

14

unless the A&E policy it issued GPA covered Beverly's clams.  We therefore

begin our resolution of the first issue by examining the policy's coverage.  We then

consider whether the facts alleged in Beverly's complaint fell within the ambit of

this coverage.

The policy's coverage was set out in Paragraph I of its Insuring Agreements,

as follows:

> I.    Coverage: Claims Made Provision.  The Company [Evanston]
> will pay on behalf of the Named Insured all sums in excess of
> the deductible amount stated in the Declarations which the
> Named Insured shall become legally obligated to pay as
> Damages by reason of any act, error or omission committed or
> alleged to have been committed by the Named Insured, or any
> person or organization for whom the Named Insured is legally
> liable, provided always that:
>
> . . . .
>
> (b) The Named Insured's legal liability arises out of the
> performance of professional services as described in Schedule 1
> for the project described in the Declarations, [the construction
> of the Cape May Light and the Cape Cod Light.]

Doc. 1-2, ¶ 1, at 33. [24]

---

[24]  Schedule 1 is not contained in the record.  As indicated in part I.A., supra, the AMI-GPA Agreement required GPA to complete the design and engineering services called for by GPA's contract with Delta Queen.  AMI conceded, and the District Court found, that GPA was the policy's only named insured.  Evanston was obligated to pay a judgment against GPA to the extent the judgment exceeded the policy's deductible of $25,000 per cruise ship and was within the "limit of liability" amount of $5,000,000 for each claim and $5,000,000 aggregate.  As it turned out, Evanston settled Beverly's claim for a sum within the policy limits prior to trial.

Beverly's claims for damages against AMI, Counts III and IV of the wrongful-death complaint, were based on strict liability and negligence, respectively.  In Count III, Beverly alleged, essentially, that AMI installed the bulkhead door that caused Captain Beverly's death and that the door was defective and unreasonably dangerous for several reasons, including that a person caught or trapped in the door could not reach or activate a release mechanism to disengage or release the door.  The facts underpinning Count IV were that AMI was negligent in installing a bulkhead door containing the defects described in Count III.

It is obvious that these factual allegations did not bring Beverly's claims within the coverage provided by Paragraph I of the Insuring Agreements.  AMI concedes as much.  This coverage obligated Evanston to satisfy any judgment Beverly might obtain against GPA for negligently designing the bulkhead door, not a judgment recovered against AMI for negligently installing the door.  Because the Insuring Agreements provided AMI no coverage, AMI had to find coverage elsewhere in the insurance policy.

AMI points to two endorsements to the policy, Endorsements Nos. 10 and 11, as providing the necessary coverage.  Both were issued pursuant to the AMI-GPA Agreement.  According to AMI, the endorsements made it a third-party beneficiary of the insurance contract, giving it the status of an insured and the right to a defense at Evanston's expense.  The District Court agreed.  It found that

16

Endorsements Nos. 10 and 11 evidenced Evanston and GPA's intent that the policy primarily benefit AMI and "explicitly extend[ed] coverage to AMI" for Beverly's claims. Doc. 88, at 8–10.[25] Because Florida law obligates insurers to defend only their insureds, Nateman v. Hartford Cas. Ins. Co., 544 So. 2d 1026, 1027 (Fla. 3d Dist. Ct. App. 1989), the court necessarily held by implication that AMI was an insured.

Endorsement No. 10 amended one of the policy's exclusions, Exclusion I. That exclusion states:

> The Insuring Agreements and all other provisions of this policy shall not apply to:
>
> I. Liability assumed by the Named Insured by agreement, whether written or oral, including, but not limited to, hold harmless and indemnity clauses, warranties, guarantees, certifications or penalty clauses, unless such liability arises from an error, omissions or negligent act of the Insured and would have attached in the absence of such agreement.

---

[25] The court also found that AMI's payment of the policy's premium directly to Evanston constituted further evidence that Evanston and GPA intended to make AMI a third-party beneficiary of the policy's coverage. In our view, that finding was immaterial to a proper construction of the policy. As an initial matter, "[w]here the language in an insurance contract is plain and unambiguous, a court must interpret the policy in accordance with the plain meaning so as to give effect to the policy as written"; extrinsic evidence of the parties' intent is not relevant to the analysis. Wash. Nat'l Ins. Co. v. Ruderman, 117 So. 3d 943, 948, 952 (Fla. 2013). Moreover, the payment was part of the contract price AMI paid GPA for performing engineering services. AMI either paid the premium amount to GPA, which would in turn pay Evanston, or AMI would pay Evanston directly. AMI chose the latter option simply to ensure that the premium got paid.

Doc. 1-2, at 34.  This form of exclusion is standard in most commercial general liability policies.  It omits from coverage the liability of non-insureds assumed by the named insured under an agreement with the non-insured to indemnify or hold harmless the non-insured.[26]  Endorsement No. 10 repeated the language of Exclusion I, and it added a second sentence, emphasized below:

> . . . Liability assumed by the Named Insured by agreement, whether written or oral, including, but not limited to, hold harmless and indemnity clauses, warranties, guarantees, certifications or penalty clauses, unless such liability arises from an error, omissions or negligent act of the Insured and would have attached in the absence of such agreement.  However, this exclusion shall not apply to liability of the Named Insured for a breach of the express contract described below [the AMI-GPA Agreement], but only to the extent that the liability is the result of an act, error, or omission of the Named Insured arising out of the professional services described in the Declarations.

Doc. 26-2, at 37 (emphasis added).

The first sentence of the endorsement reprinted the language of Exclusion I, which provided AMI no coverage.  See Siegle v. Progressive Consumers Ins. Co., 819 So. 2d 732, 740 (Fla. 2002) ("[P]olicy exclusions cannot create coverage where there is no coverage in the first place." (quotation marks omitted)).  And the

---

[26] See 1 Barry R. Ostrager & Thomas R. Newman, Handbook on Insurance Coverage Disputes § 7.05 (16th ed. 2013).  This kind of exclusion typically "does not refer to the insured's breaches of its own contracts."  Id.; see also, e.g., S. Guar. Ins. Co. v. Zantop Intern. Airlines, Inc., 767 F.2d 795, 798 n.3 (11th Cir. 1985); Auto Owners Ins. Co. v. Travelers Cas. & Surety Co., 227 F. Supp. 2d 1248, 1269–70 (M.D. Fla. 2002); 9 Lee R. Russ & Thomas F. Segalla, Couch on Insurance 3d § 129:31 (2005 & Supp. 2014).

18

second sentence merely clarified the first sentence: if AMI were to bring a breach-of-contract claim against GPA and prevail, GPA would have coverage and Evanston would pay AMI's judgment, provided that GPA's liability for the breach was based on its performance of professional services. In short, Endorsement No. 10 did not transform Exclusion I into an insuring agreement and thereby provide AMI with coverage for its own tortious conduct.

Turning to the second endorsement on which AMI relies, Endorsement No. 11 stated:

> In consideration of the premium charged, such insurance as is afforded by this policy applies to the liability of others imposed by law, which is assumed by the Named Insured under the contract described below [the AMI-GPA Agreement], but only to the extent that the liability of others is the result of an act, error, or omission of the Insured arising out of the professional services described in the Declarations.

Doc. 1-2, ¶ 1, at 24. AMI contends that although Evanston did not expressly include AMI as an insured under the policy, Evanston intended that Endorsement No. 11—read against the background of Endorsement No. 10—create coverage for the claims Beverly stated in Counts III and IV of her complaint.[27] Consequently,

_____

[27] In its motion for summary judgment, AMI argued that GPA's agreement "to provide the professional services under th[e] [AMI-GPA] Agreement in a manner that is consistent with all appropriate professional standards," Doc. 1-2, ¶ 2, at 2, qualified as "liability of other[s] imposed by law [the law of contract]," Doc. 38, at 7 (second alteration in original). The

19

AMI argues, Evanston was required to provide it with a defense against those claims.  We are not persuaded.

Endorsement No. 11 stated, in essence, that the coverage the A&E policy afforded GPA would apply to AMI, too, if AMI were held liable to Beverly (or anyone else) for an "act, error, or omission" of GPA in its performance of professional services in connection with AMI's construction of the Cape May Light.  Thus, had Beverly, in her wrongful-death action, obtained a judgment against AMI based on a finding that GPA's negligence in designing the bulkhead door caused Captain Beverly's death, Evanston would have paid the judgment.[28]  But this never came to pass; AMI was never adjudged liable to Beverly due to GPA's negligent design of the bulkhead door.  Rather, American Home, for AMI, settled with Beverly prior to trial.

argument was meritless.  The phrase "liability imposed by law" does not mean "the law of contract."  See Ostrager & Newman § 7.01 ("The phrase . . . 'liability imposed by law' refers to the liability of the insured arising from the breach of a duty that exists independent of any contractual relationship between the insured and the injured party.").

AMI has also argued that the phrase "such insurance . . . applies to the liability of others imposed by law" means that "others" are insureds.  See Appellees'/Cross-Appellants' Br. 15–16.  But the phrase "liability of others imposed by law" in Endorsement No. 11 specified the category of liability to which insurance extended, not who qualified as an insured.  In this case, the endorsement would have extended coverage to GPA in the event that a third party obtained a judgment against AMI requiring it to pay tort damages because of GPA's professional negligence in designing the Cape May Light or the Cape Cod Light.

[28] Evanston confirmed at oral argument that it would have paid the judgment to the extent it was within the policy's limits.

AMI's argument seems to be that the fact that it settled Beverly's claims rather than suffer the entry of a judgment of "liability imposed by law" should not matter: as a third-party beneficiary of the insurance contract, the mere possibility that it might have been found liable to Beverly based on GPA's negligent design of the bulkhead door entitled it to a defense. We disagree. After considering what would have transpired had Evanston acceded to AMI's demand to step in and take over its defense, we conclude that AMI was not a third-party beneficiary as the District Court found.

Here is what would have happened had Evanston assumed AMI's defense: In providing both its named insured (GPA) and AMI with a defense to Beverly's claims, Evanston would have found itself in a conflict of interest. To avoid the conflict, instead of selecting counsel to represent the respective parties, thereby maintaining some control over the conduct of their defenses, Evanston would have had to give the parties the funds to employ counsel of their choice and to pay the expenses incurred in their separate defenses. See Fla. Stat. § 627.426(2) (requiring insurers, after providing written notice of their reservation of rights, to either refuse to defend, obtain a nonwaiver agreement from, or retain mutually agreeable independent counsel for an insured). The Evanston-funded attorneys for GPA and AMI would have separately answered Beverly's complaint and denied liability for Captain Beverly's death. AMI's attorney would have also filed a cross-claim

21

against GPA, alleging that GPA's negligence in designing the bulkhead door was the sole cause of Captain Beverly's death.

Evanston and GPA could not have intended such an arrangement. True, they agreed that Evanston would indemnify AMI for any liability "imposed" on it "by law" due to GPA's negligent performance of professional services. But they hardly intended that Evanston, at GPA's expense,[29] would finance AMI's cross-claim to establish that GPA's negligence led to such liability. To determine otherwise would require us to assume that GPA agreed to fund suits to establish its own professional negligence—as only a judgment that it was professionally negligent would bring AMI's claim within the A&E policy's coverage. It would also require us to assume that Evanston agreed to fund lawsuits to establish liability resulting in a judgment for which it would be responsible for paying.

In sum, we find no basis for the District Court's third-party-beneficiary finding and set aside the court's determination that Evanston was obligated to provide AMI a defense.

## B.

The second issue before us in this appeal is whether the District Court erred in holding Evanston liable for the $325,000 sum American Home paid Beverly to

---

[29] See supra note 25.

22

settle her claims.  The short answer is yes.  American Home failed to establish, as required by Endorsement No. 11, that AMI's liability for Captain Beverly's death was the result of an "act, error, or omission of [GPA] arising out of the professional services" it had performed.  This feature of Endorsement No. 11 mirrored the procedure required by Florida Statutes § 627.4136, which provides, in relevant part:

> It shall be a condition precedent to the accrual or maintenance of a cause of action against a liability insurer by a person not an insured under the terms of the liability insurance contract that such person shall first obtain a settlement or verdict against a person who is an insured under the terms of such policy for a cause of action which is covered by such policy.

That the A&E policy mirrors this Florida statute should not be surprising, as insurance policies in Florida incorporate the requirements of Florida's insurance code.  E.g., Hassen v. State Farm Mut. Auto. Ins. Co., 674 So. 2d 106, 108 (Fla. 1996); Dep't of Ins. v. Teachers Ins., 404 So. 2d 735, 741 (Fla. 1981) (citing Bd. of Pub. Instruction v. Town of Bay Harbor Islands, 81 So. 2d 637 (Fla. 1955)).

## C.

Because we reverse the District Court's judgment in favor of AMI and American Home and direct the entry of judgment for Evanston, the court's award of attorney's fees under Florida Statute § 627.428 is also reversed.

23

III.

For the foregoing reasons, the judgment of the District Court is

REVERSED.  On receipt of our mandate, the court is directed to enter judgment

for Evanston.

SO ORDERED.

24